TRIPP, *appellant*, and COOK, *respondent*.

An *appeal* lies from the decretal order of the Chancellor refusing to open the sale of mortgaged premises and grant a re-sale, on the application of a defendant, although he has permitted the bill to be taken against him *pro confesso*.

A *re-sale* will be ordered where the mortgaged premises have been sold *greatly below their value*, and *bought in by the mortgagee*, if the mortgagor, or those standing in his place, have been misled by the mortgagee, or even by a third person, in reference to the foreclosure of the mortgage, and in consequence thereof do not attend the sale.

Mere *inadequacy of price*, unattended by other circumstances, is not enough, *it seems*, to open a sale.

A court of equity, in settling the rights of parties, will not look beyond the circumstances of the transaction in respect to which relief is asked by one party, and take into consideration other and different transactions set up by the other party as presenting equities on his side.

APPEAL from Chancery. This is an appeal from an order of the Chancellor, refusing to *open a sale* of mortgaged premises, and to order a *re-sale*. *Tripp* was the holder of a mortgage upon two lots of ground in the city of Albany, executed to him by Walter Cunningham, bearing date 21st September, 1836, given to secure the payment of $1,500, with the interest thereof, in three years. A few days after the date of the mortgage, he *assigned* the same, together with a bond executed by Cunningham as collateral security for the payment of the money, to *Cook*, the respondent, and *guarantied* the payment of the same. On 28th February, 1840, Cook filed a bill for the foreclosure of the mortgage, making Cunningham and Tripp parties defendants thereto, and *subpœnaes* to appear and answer were duly served upon them: on Tripp on the day next after the filing of the bill, and on Cunningham, within a few days thereafter. The bill was taken *as confessed* against Tripp for want of appearance on 24th March, 1840, and against Cunningham for want of an answer on 5th May, 1840. A master's report was made on 14th May, shewing the amount due on the bond

1841. Tripp v. Cook.

and mortgage to be $1,672.86, and on 25th May, a *decree* for the sale of the mortgaged premises was made, containing a clause, that Cunningham and Tripp pay any deficiency that might exist after sale of the mortgaged premises, and that the complainant have execution therefor. On the 10th July, the mortgaged premises were sold by a master at public vendue, and one of the lots was *struck off to the complainant* for $200; and the other to John McPherson for $10. The master executed deeds to the purchasers, and reported the sale, and that there remained a *balance* due to the complainant, including interest and costs of $1,691.52. An order *confirming* the sale was entered 23d July, 1840, and on the first day of August following, an *execution* was issued against Cunningham and Tripp *for the balance* reported by the master to be due, which was levied upon the property of Tripp on or about the third day of August.

Tripp thereupon presented a petition to the Chancellor, stating in substance, that within a week after the service of the *subpœna* upon him, he had an interview *with the complainant*, and with an agent of Cunningham, and understood from a conversation with them, that it had been agreed that the suit should be settled and stopped, the complainant having consented to take Cunningham's notes for the debt, who, at that time, was possessed of a large real and personal estate, and in good credit; but had lately become *insolvent*, and made an assignment of his property; that he remained under the impression and belief that no further proceedings would be had in the cause, until he was called upon by a deputy of the sheriff of Albany with the execution, when he immediately went to the complainant and asked him to waive the sale, or to assign his bid to him, and he would pay the amount due upon the mortgage; that within two or three days thereafter, a more distinct offer was made, viz: to pay the costs of the sale and subsequent proceedings, and on a re-sale of the mortgaged premises, to bid at least $1,000 for the lot which had been

struck off to the complainant, and pay the balance of the decree directly after the re-sale: which offer was refused, unless the defendant would consent to make the complainant whole in reference to a transaction between them as to the conveyance of some real estate in Geneva, made by the defendant to the complainant; in regard to which the complainant alleged that he had suffered loss by the improper conduct of the defendant: in respect to which transaction, the defendant deposed, that the complainant had *no ground of complaint* whatever. The defendant deposed, that the lot *struck off to the complainant was worth* $2,000; and that the lot struck off to *McPherson* was worth $1,000; the latter being subject, however, to incumbrances of about $500; and concluded by praying that the sale to the complainant and to McPherson be set aside and that a re-sale be ordered, or for such other or further relief as to the Chancellor should seem meet. On this petition an order was granted, that the *complainant* and *McPherson* show cause, &c.

On the day of showing cause, an affidavit of the complainant was read, admitting a negotiation between him and Cunningham as to the taking of notes for the debt, and his agreement to accept the same, provided the suit was thus settled before the first day of May, but utterly denying any agreement to suspend proceedings in the suit until that day; that since the purchase made by him at the master's sale, he had sold the lot struck off to him to one Patrick H. Griffin, for the sum of $1,200, and executed a deed to him; that Griffin had paid him $200 in money, $200 in a note payable in ninety days, and secured the residue by his bond, and by a mortgage on the lot conveyed to him. In relation to the conveyance of the property at *Geneva*, he deposed, that the defendant had *represented* it to be worth $1,000, whereas it was not worth more than $600; and that he had accepted the conveyance, in part payment of a debt due to him from the defendant, under circumstances which precluded him from making the ne-

1841.

Tripp v. Cook.

cessary inquiries as to the value of the property. *McPherson*, also, appeared and showed cause, as did *Griffin* also, under a subsequent order made by the Chancellor.

The Chancellor denied the relief prayed for, with costs as to McPherson and Griffin, but without costs as to the complainant. The following opinion was delivered by him:

By the CHANCELLOR. This is an application by the defendant Tripp, to set aside a sale of mortgaged premises purchased in by the complainant, and subsequently sold to Griffin; or to stay the proceedings against Tripp for the deficiency which remained due beyond the amount for which the mortgaged premises were sold. The premises undoubtedly sold for much less than their value; but there was no irregularity in the sale; and if the petitioner was deceived as to the time of the sale, it was the fault of his co-defendant, Cunningham, and not of the complainant or his solicitor. Where the mortgagee or complainant himself becomes the purchaser, the court has not always held the sale so conclusive, as where the property has been purchased by one who was an entire stranger to the suit, who had bid for the purpose of investment merely. And perhaps this would be a proper case to interfere, as against Cook himself, if he had not shown that he had good reasons for holding Tripp to what otherwise might have been considered an unreasonable speculation at his expense.

The case of *McDonald* v. *Neilson*, in the court for the correction of errors, 2 *Cowen* 190, appears to be an authority for refusing to set aside this sale, on account of what had occurred between these parties in relation to the Geneva purchase. Griffin is a bona fide purchaser from the original vendee at the master's sale, and had paid a part of his purchase money before he knew that any attempt would be made to set aside. I think, therefore, that I ought not to disturb the sale; or to deprive Cook of the benefit of his speculation, as a fair off-set for the injury

he alleges he has sustained in the other transaction. The application must, therefore, be denied with costs, as to Griffin, but without costs as to Cook, who has made enough by his speculation to enable him to bear his own costs on this application without loss to himself.

As between Cunningham and Tripp, the former is unquestionably bound to pay the deficiency, as Tripp stands merely in the situation of a surety. He is, therefore, entitled to the benefit of the decree, so far as it is a lien upon the real estate of Cunningham, to compel the payment of this deficiency by the real debtor. The complainant therefore, upon receiving satisfaction of his debt by Tripp, the surety, is to assign all his interest in the decree to the latter, to enable him to collect the deficiency from the estate of Cunningham, at his own risk and expense. And if necessary to enable him to do so, the order may direct that this execution, which has been levied upon the personal property of Tripp, be set aside; provided, Tripp, within twenty days from the time of this decision, pay to the complainant the amount necessary to entitle him to an assignment of the decree.

A decree was entered accordingly, from which as it respected all that portion denying relief against Cook, the defendant Tripp appealed to this court, where the cause was argued by

*R. W. Peckham* and *S. Stevens* for the appellant.

*J. Rhoades*, for the respondent.

*Points submitted and argued on the part of the appellant:*

*First.* The sale to the respondent should be opened in this case, *as between the respondent*, who was *complainant and purchaser*, and the appellant, who stands here as a mere surety, and who offered to give four hundred per cent in advance of the purchase money, "on the ground

1841. Tripp v. Cook.

of the sacrifice of the interest of the party applying," and because "justice requires it." *Lansing* v. *McPherson*, 4 *Johns. Ch. Rep.* 426. *Collier* v. *Whipple*, 13 *Wend. Rep.* 228.

*Second.* The sale should be opened on the ground of surprise to the appellant, produced by the acts and declarations of the respondent, and of the agent of the party primarily liable to pay the mortgage, and a defendant in the suit. *Williamson* v. *Dole*, 3 *Johns. Ch. Rep.* 291. *Duncan* v. *Dodd*, 2 *Paige Rep.* 99. *Collier* v. *Whipple*, 13 *Wend. Rep.* 226. But the Chancellor held, as appears by his opinion, that a proper case had been made out to open the sale, and rests his denial of the motion, on the ground of the injury the respondent "*alleges he has sustained*," in other and entirely different transactions.

*Third.* The Chancellor should not have taken the transaction in reference to the Geneva property into consideration at all, in deciding this motion. Because 1. It is entirely foreign to, and has no connection with, the merits of the case before the court. 2. It is passing judgment against a party without any sort of legal notice to him, or affording him an opportunity of controverting the matters adjudged. It is no where pretended in the affidavits, that the grounds or facts on which the appellant rested his claim to relief as to the Geneva property, were communicated to the respondent prior to the motion. 3. No grievance or case for relief, was made out by the respondent as to the Geneva property, even with his information and belief, which is no evidence in *defence* of a motion.

*Fourth.* But if the Chancellor admitted all the claim of the respondent, and refused to open the sale, then he should have ordered a credit on the execution in this case of six hundred dollars, as the claim of the respondent to relief as to the Geneva property was only to four hundred dollars, in any event.

*Fifth.* If it should be supposed that the sale of the premises by the respondent to Griffin, precluded the Chancellor from opening the sale, then the Chancellor should have allowed to the appellant the avails of such sale upon equitable terms.

*Points submitted and argued on the part of the respondent:*

The relief or favor sought by the appellant to be obtained, ought not to have been granted, in any or either of the forms sought:

I. Because if Cook had not parted with his title acquired by the master's deed, and there were no other equities as between him and Tripp, the sale ought not to have been disturbed. A sale cannot be set aside or biddings opened, on any other grounds than *surprise*, *accident* or *fraud*, or some other ground of purely equitable relief. *Gordon* v. *Sims*, 2 *McCord's Ch. Rep.* 159. If the sale has been regularly made and fairly conducted, it is obligatory.—*Id.* Inadequacy of price is not *per se* a ground for setting aside a sale of land. *Reed* v. *Brooks*, 3 *Litt.* 127. *Hart* v. *Bleight*, 3 *Monro* 273. *Livingston* v. *Byrne*, 11 *Johns. R.* 555—565. *Williamson* v. *Dale*, 3 *Johns. C. R.* 290. When the eight days are passed, and the sale confirmed, the purchaser's title is *complete*, and the sale cannot be opened. *Aubrey* v. *Denney*, 2 *Molloy* 508.

II. The execution could not be set aside, nor a perpetual stay thereon ordered, as asked by the appellant; because the respondent was entitled to the execution by statute, and the decree awarded it; and the appellant did not ask to vacate or modify the decree. 2 *R. S.* 191, § 152, 154.

III. The Chancellor was right in refusing to order the decree to be declared satisfied as to the appellant, or that the amount of the consideration money expressed in the deed to Griffin, less the two hundred dollars bid for them

1841. Tripp v. Cook.

by Cook, be endorsed on the execution; because Griffin had not paid the same or any part thereof thus sought to be applied, and the appellant did *not offer* to pay it and take an assignment of the note and bond and mortgage.

IV. It would have been against equity and good conscience to deprive the respondent of the *fruits* of his purchase, if the court would not have deprived him of the premises purchased, had he still owned them.

V. Independent of all other reasons, the acts of the appellant in relation to the conveyance of the Geneva property to the respondent were so marked with fraud, misrepresentation and breach of trust, that he ought not to have been relieved in any court, except on the terms offered by the respondent, *and declined by the appellant. McDonald* v. *Neilson*, 2 *Cowen* 139—194.

On the case coming up for decision, Mr. *Justice* COWEN observed that, inasmuch as Tripp had suffered the bill to be taken against him as confessed, he must be considered as having suffered a default, and therefore not entitled to prosecute an appeal within the decision of this court, in *Rowley* v. *Van Benthuysen*, 16 *Wendell* 369. Besides the application made by him was addressed to the mere *discretion* of the Chancellor, and he having seen fit under all the circumstances of the case to deny the application, it was not a proper case for review, as is also fully shown in the opinion delivered in *Rowley* v. *Van Benthuysen*. He deemed this a mere question of practice. The defendant complained that the plaintiff had proceeded in the prosecution of the suit, after having lulled him into security, and had gained an undue advantage from which he asked relief. How can this be distinguished in that point of view, from a motion to open a default unduly obtained. He therefore moved that the appeal be dismissed.

*Senator* VERPLANCK said, that he could not consider this as a mere question of practice. He deemed it a question

involving a great and important principle; and, although the application made by the appellant was addressed to the *discretion* of the Chancellor, still it was of a character which might and should be reviewed. The decision of the Chancellor granting a re-sale, although resting in discretion, was reviewed here in *Collier* v. *Whipple*, 13 *Wendell*, 224, and he perceived no reason why a decision, refusing a re-sale was not equally the subject of review. (He said he had reduced his opinion to writing, but had it not then in court, but would give it to the reporter for publication. The following opinion was subsequently delivered to the reporter:) "A preliminary difficulty has been presented to the decision of this case on the merits. It is maintained that the granting, or not granting relief, by a re-sale or otherwise, to persons injured by sales under foreclosure, at an inadequate price, from whatever cause, is subject of pure judicial discretion in the court of chancery, and so completely within its absolute control as not to be subject to appeal. The case of *Rowley* v. *Van Benthuysen*, 16 *Wendell*, 190, and another case more recently decided, but not reported, are relied upon as establishing the rule in this court. Both those cases, decided that this court would not entertain an appeal from an order of the Chancellor refusing to vacate an order that a bill should be taken *pro confesso*, and to grant a party leave to put in an answer. The principle established by them is, that the appellate court will not undertake to regulate the practice of the courts below, or to entertain appeals on decisions, merely regulating their modes of proceeding, and within the judicial discretion of the courts, not to be resolved into any general, legal, or equitable principles, nor passing upon the merits of the controversy. The soundness of the decisions cannot be questioned, nor do I desire to restrict them to mere openings of defaults; but the principle does not reach cases like this under review. It refers strictly to the practice of the courts and to questions of pure and unmixed judicial discretion. It is not always easy to distinguish

1841. Tripp v. Cook.

theoretically between matters of practice in chancery, which are subject to such discretion, and those which dispose of the rights of the party and may be decided upon broad principles of lasting and general application. But this court would violate its constitutional duty if it refused to hear appeals of the latter class, only because they were presented by orders or decisions upon the course of proceedings. The cases decided here, and now confidently appealed to, were simply exercises of the judicial discretion of this court as to its own appellate powers; for the authority given us by statute would authorize us to "reverse, affirm or alter any order" brought up on appeal. But we have felt the utter impossibility of reviewing the mass of orders relating to the practice and proceedings of the court; we saw that the entertaining such appeals would be oppressive and injurious, if it were possible, and we have adopted the rule so strongly urged by Chief Justice Kent, on a similar occasion, that "a reasonable confidence must always be entertained that a court will exercise its discretion soundly."

But although injunctions, and decisions touching them, fall within the literal definition of practice and proceedings in equity, are governed by judicial discretion, and are often not final, no one has ever contended that these were not subject to review, though such cases swell our calendar every term. The present case is, I think, as little within the decision of *Rowley* v. *Van Benthuysen.*

Judicial discretion is a phrase of great latitude; but it never means the arbitrary will of the judge. It is always (as Chief Justice Marshall defined it,) "a legal discretion to be exercised in discerning the course prescribed by law; when that is discerned it is the duty of courts to follow it. It is to be exercised, not to give effect to the will of the the judge, but to that of the law." Such a discretion may be exercised in relation to the convenience of courts and suitors and the expedition of business, or upon the evidence as to some interlocutory matter, on which one tribu-

nal could not well prescribe to, or even advise another. It may also be exercised in deciding on the application of one or other of two conflicting rules, according to special circumstances, or else in cases of doubt where the decision is not governed by the absolute certainty of law, but rests upon the probabilities of evidence. It is in this last sense that the granting of new trials in cases of verdicts against evidence or excessiveness of damages, in common law courts, is said to be in their "judicial discretion," which is yet clearly a discretion to be exercised according to law and subject to review. 1 *Burrows' R.* 391, *and* 1 *Lev. p.* 97, *there cited.* I do not pretend to draw the precise line of distinction between these gradually assimilating degrees of legal discretion. But it is enough to say that it is the former species only which is of necessity confined to the breast of the court exercising it, exempt from any superintending examination. Judge Sutherland has given a definition of that discretion which is not subject to appeal, which has been adopted and argued from in the cases cited: "It is that discretion which cannot be governed by any fixed principles or rules." This does not apply here. The rules and principles of relief, when property has been sacrificed at mortgage sales through fraud or error, have been settled in various adjudications by several chancellors, especially Eldon and Kent. They have refused to relieve for simple inadequacy of price; they have granted relief upon loss from fraud, from fraudulent negligence or other misconduct of a third person, and even from "a surprise." I could not desire any more decisive evidence that such cases involve "fixed principles of equity," than is furnished by the luminous and conclusive opinion of Chief Justice Nelson, in *Collier* v. *Whipple*, 13 *Wendell* 224, where he lucidly summed up the learning of this branch of equity jurisprudence, and deduced from the decisions an equitable application of their principles to an entirely new case.

So far as this preliminary question is governed by authority, it must be settled by our decision in the case of

1841. Tripp v. Cook.

*Collier* v. *Whipple*, where a case of relief against a ruinous sale, specially injurious to judgment creditors, was argued by able counsel, and decided upon elaborate examination of principles and authorities, without any doubt being raised as to the propriety of exercising the appellate jurisdiction; when, if such a doubt were well founded, it would have been conclusive. Besides this, I understand that in more than one case, chancellors have not hesitated to set aside or modify such orders or decisions of their vice-chancellors, without any dread of trespassing upon the privileges of judicial discretion.

But we have another conceded test of the propriety of reviewing or not reviewing such orders. It is that of the decision "disposing of the rights of the party in litigation, or involving the merits of the controversy." How does this test apply here? The debt and the mortgage are not disputed: the main point of the rights, interest and merits involved, is the just and prudent application of the hypothecated property to the payment of the debt, with the least possible loss to the mortgaging owner or others interested.

If that be not the object in view, I see no need for the superintendence of a court of chancery or its officers. If there be any point touching the merits of the subject of equity proceeding in this cause, that now presented on appeal must be the one. If, to these considerations, we add that of the great public importance of rightly settling the rules and principles of relief against unavoidable losses, and deciding when it ought not and when it ought to be granted, in the immense sales under foreclosure which annually take place, without leaving each case to arbitrary and irregular, though it may be impartial judicial discretion—we are bound, in my judgment, to decide upon this case for ourselves, according to the best lights of authority, experience, prudence and equity.

*Senator* Lee said, that whilst he had no doubt that an order made by the court of chancery on a question arising upon the *mere practice* of the court, is not the subject of appeal, his convictions were equally strong that the order made in this case was properly brought up for review. This is not a question of practice, but one of principle. The defendant was misled by the complainant; he was thrown off his guard; and property in which he was deeply interested has been sacrificed. He asks not that the decree shall be opened, and he be permitted to interpose a defence. He is willing that the default shall remain; but he asks that he be restored to the condition in which he would have been, had he suffered a default and not been deluded into the belief that the suit was settled. Then he might have attended the sale and guarded his rights.

*Senator* Furman expressed his disapprobation of the decision in the case of *Rowley* v. *Van Benthuysen*, and said that it ought to be over-ruled.

*Senator* Paige, on the other hand, approved of the principles upon which that case was decided.

*The* Chancellor, who was present during the delivery of the opinions just noticed, observed that the disposition of the case of *Rowley* v. *Van Benthuysen* by this court, was different from what, in his judgment, it should have been. He was decidedly of the opinion that appeals should be allowed in every case not manifestly frivolous. The constitution of the court, and the numberless questions brought before a single judge for adjudication, required that parties should have the privilege of bringing up his decisions for review whenever they thought proper so to do, and thus testing their correctness. In his view of the subject it was the only mode in which the court of chancery could be preserved.

1841. Tripp v. Cook.

The question was then put, *Shall this appeal be dismissed?* Whereupon the members of the court divided as follows:

*In the affirmative:* Mr. *Justice* COWEN, and *Senators* DENNISTON, HUNTER and SCOTT—4.

*In the negative:* The PRESIDENT *of the Senate*, and *Senators* DIXON, ELY, FURMAN, HOPKINS, HULL, HUMPHREY, HUNT, LEE, H. A. LIVINGSTON, NICHOLAS, RHOADES, STRONG, VERPLANCK, and WORKS—15.

Of course the motion to dismiss the appeal was lost. The question then arose, *Shall the decree be reversed?* Whereupon the following opinions were delivered:

*By Senator* VERPLANCK. Questions of opening biddings, and setting aside or modifying mortgage sales, cannot be governed merely by authority, nor are they matters of arbitrary discretion, depending upon the convenience or custom of the court and its officers. They are to be decided according to general principles of equity, somewhat modified by considerations of public policy, and applied to the peculiar circumstances of the case. The mortgagor and those who stand in his place and share in his losses have a right to be protected, so far as is consistent with the mortgagee's rights, against needless sacrifice of their property, whilst the mortgagee can claim nothing beyond the amount of his loan. Hence, as between these parties only, if from any cause whatever, the mortgaged property should be sold very far below its market value, to the injury of the owner or of others interested in it under him, as his sureties or otherwise, it would always be a claim of strict justice, to allow the opportunity of a second sale, upon such terms as will secure the mortgagee's debt.

But in order to carry into effect the object of such sales, and to secure reasonable competition and confidence amongst bidders, it is also necessary that courts should refrain from disturbing the rights acquired by or under pur-

chasers at a fair public sale, however inadequate the price, where the parties interested, having due notice, have yet neglected or been unable to protect their interests. Mere lowness of price ought not to furnish a sufficient reason to set aside sales, because if this were allowed, a great inducement to bidders would be taken away, wealthy and sure bidders would be excluded, and the bidding left to those who took the chance of doubtful speculation. Lord Eldon's experience during half a century of the practice and administration of equity, led him to condemn the English custom of opening biddings, even at sales much less dependant upon public and open competition than ours, as having caused many estates to be thrown away from the uncertainty of the sale, and the expectation of an opening of the bidding. It is therefore a wise rule of general expediency, especially under our system of sales at auction, that the court of chancery, as the common guardian of all the parties in each case, and at the same time of all similar interests, present and future, should consider every fair sale as final. Accordingly Lord Eldon thought, *Morris* v. *Bishop of Durham*, 1 *Ves. jr. R.* 57, that "the only case in which biddings should be re-opened, was when there was some fraud or misconduct in the purchaser, or fraudulent negligence in another person, of which it would be against conscience that the purchaser should take advantage." This strict rule he relaxed farther in an after case, *White* v. *Wilson*, 14 *Ves. jr. R.* 151, by allowing "a surprise created by the conduct of the purchaser," to be a valid ground of relief. Chancellor Kent acknowledged the validity of this ground, and granted similar relief upon it, but added, "I do not lay any stress upon the alleged inadequacy of price; such a ground alone, unattended with other circumstances, is not sufficient." *Williamson* v. *Dale*, 3 *Johns. Ch. R.* 290.

Still although the court should not interfere with a fair sale, merely to set aside a very cheap purchase, yet there may be cases where such a sale, though fair as to the buyer,

1841.

Tripp v. Cook.

is not so as to others interested. The cases of fraud or fraudulent negligence, or surprise, caused by the conduct of others, have been allowed by the ablest Chancellors, to make sales for inadequate prices "against *conscience.*" This court applied the same rule in *Collier* v. *Whipple*, 13 *Wendell* 226; in which the sale was opened, where judgment creditors were prevented from attending and bidding in consequence of an impression received from the master that the sale would not take place, although it was admitted that there was no fraud, trick, collusion, or official misconduct.

When parties interested in the proceeds of a sale thus suffer by default of others, the question of relief resolves itself into equitable principles, of frequent application in chancery, because the sale at an inadequate price, under such circumstances is, in the nature of a sale made by mistake or in consequence of fraudulent misrepresentation. Where the buyer is the holder of the mortgage he must surely be content if his debt is paid. He has commonly an entire control over the proceedings and sale, and has no right to use it for any purpose of advantage beyond securing himself. Nor does the holder stand upon the same footing of public policy with other buyers. He seldom purchases for investment or use. He bids to secure himself, and when he buys in, he takes the property in payment of so much debt. But when other purchasers come in, or even second purchasers from the purchasing mortgagee, it would be the obvious duty of equity to conciliate as far as possible, all these considerations, and to disturb the titles of fair purchasers as little as can be made consistent with due regard to the strong equities of a deceived or misled party. It is natural that these somewhat conflicting claims of policy and expediency as to the efficiency and security of such sales, on one side, and individual hardship and oppression on the other, should lead to apparently jarring conclusions in the minds of different judges. Still such cases are governed by fixed equitable

principles to be applied, as in other instances, according to circumstances.

We have now before us, a sale for a totally inadequate price, where part of the mortgaged property was purchased by a *third party*, at something more than half its value, including the incumbrance upon it. The rest of it is bought by the holder of the mortgage, for less than one-sixth of its market value, and then re-sold at six times the amount of his bid. Thus a deficiency of $1,672 is left, for which the appellant is personally liable, whilst $1,200 of that amount has been realized by the respondent in his sale of the lots. Had there been nothing to mislead any of the injured parties, and this result had arisen from simple neglect or absolute inability to prevent it, that would have presented a case of hardship indeed, but still one in which it would be impossible to grant relief upon any recognized principle, consistently with public utility or the rights of others. But here it appears that the appellant was misled in his expectations as to the sale, by the representations and undertakings of his co-defendant, through his agent, and his consequent reliance that the mortgage would be settled by the original mortgagor. The respondent's acts and declarations, though not intentionally deceptive, were such as to support that expectation. This, then, is a *prima facie* case for relief, according to the rules and decisions of equity. But the subsequent sale to Griffin is not impeached by any such evidence as to show it to be collusive; and a title fairly acquired, ought not to be disturbed without absolute necessity. The appellant should not be allowed to suffer by the erroneous statements and representations of the other parties. The respondent has no just claim to make a profit out of the transaction; nor can he complain if he gets his whole debt, with interest and costs.

I conclude, then, that equality between all the parties will be most satisfactorilly attained by leaving the title of the subsequent purchaser untouched, and considering the

1841.
Tripp v. Cook.

sale to him as made upon the appellant's account. If this be done, upon paying the amount of principal and interest due, deducting the amount of cash received by Cook, he will be entitled to receive an assignment of G[illegible]man's mortgage. It would, however, be just to allow the respondent the election of retaining the bond and mortgage and crediting the amount of principal and interest as so much of the *deficiency paid by the surety.* In either case, that part of the Chancellor's order which directs an assignment of Cook's interest in the decree to enable Tripp to collect the deficiency from his principal, should stand.

In coming to this conclusion, I have thrown out of view the transaction between the parties and the alleged fraud of Tripp upon Cook as to certain property at Geneva. This transaction is quite unconnected with this mortgage, and grows out of concerns of persons, strangers to the present debt and sale; but it is alleged to have been fraudulent, and the respondent to have suffered considerable loss by it. He now claims to be made good as to this affair before he relinquishes the profitable purchase he has made at the other's expense. The Chancellor considered this as a sufficient reason to withhold relief, allowing that "perhaps this would be a proper case to interfere as against *Cook,* if he had not shown that he had good reasons for holding *Tripp* to what otherwise might be considered as an unreasonable speculation at his expense." The case of *McDonald* v. *Neilson,* 2 *Cowen,* 190, is cited as authority for refusing to interfere on account of what passed between the same parties in another transaction.

It is a familiar maxim, that "he who seeks equity must do equity;" and that equitable relief will not be granted to a suitor unless "he comes into court with clean hands," and discharges his debts or performs his obligations to his adversary, binding upon him in conscience if not in law. But this rule cannot mean that all the previous business between such parties and others can thus be opened on a collateral issue; still less that equity shall be denied to one

*prima facie* entitled to its aid, upon the allegation of some former injury to his adversary in a matter whole disconnected with the present transaction. In all the cases I have read, including that of *McDonald* v. *Neilson*, this equitable principle is applied only to the circumstances of the very controversy then before the court, or to such as appear on the record as part of its history, or as are admitted in the pleadings, or at least are so connected with the cause in litigation as to be presented in the pleadings and proofs, with the full opportunity afforded to the party thus re-criminated to explain or refute the charges. But here the fraud and the consequent injury and its amount are shown only by the respondent's own deposition, the particulars of which the other party had no opportunity of meeting or explaining, whilst he had denied the general charge under oath; and that denial is supported by another witness, as to the improbability of any loss or injury whatever. If this alleged fraud can be thus collaterally inquired into, it is clear to my mind that it has not been proved.

I am, accordingly, of opinion that so much of the Chancellor's order as is appealed from, should be reversed; but that it would be more consistent with justice and the general policy of our mortgage sales, so to modify it as to allow the appellant the avails of the private sale upon equitable terms, than absolutely to re-open the sale and set aside Griffin's subsequently acquired title.

By the President of the Senate. Courts of equity may relieve against deeds and judgments, not only when obtained by fraud and imposition, as in *Reigal* v. *Wood*, 1 *Johns. Ch. R.* 406, and cases there cited; but also where they have been regularly obtained, if there be great hardship, or great inadequacy of consideration, with unfairness, as in the case of *Lord Cranstown* v. *Johnston*, 3 *Ves. jr.* 170, where the Master of the Rolls, Sir R. Pepper Arden, afterwards Lord Alvanley, said, "I must for-

1841. Tripp v. Cook.

get the name of the court in which I sit, if I were to refuse to grant relief." In *Morrice* v. *The Bishop of Durham*, 11 *Ves.* 57, and in *White* v. *Wilson*, 14 *Ves.* 151, Lord Eldon decided, that "Fraud or misconduct in the purchaser, or fraudulent negligence in another person connected with the sale as agent of the mortgagor, or of persons interested as judgment creditors; and also surprise by the conduct of the purchaser, will induce the court to open the biddings." The latter principle was applied in the case of *Williamson* v. *Dale*, 3 *Johns. Ch. R.* 296, by Chancellor Kent, who has been said to be "disposed to be somewhat strict in his practice on this subject." In this latter case, too, the surprise was admitted to have been unintentional.

In *Lansing* v. *McPherson*, 3 *Johns. Ch. R.* 424, the sale was re-opened in behalf of a person who stood responsible for the balance due on the bond and mortgage after the sale, and who offered fifty per cent more than the bid. No unfairness in the purchaser was pretended. The excuse was, that the applicant did not know, until after the sale, that the plaintiff had a decree compelling him to pay the deficit, the decree having been entered by default. This last case is strongly analogous to that now under review before this court, although less favorable than the latter to the appellant. It is also particularly interesting as recognizing a principle strongly sustained by the English courts of equity, as well as our own, viz: In all cases of insolvent estates, to take care that their assets be applied, as far as possible, to the payment of the just claims of all their creditors; and to prevent any individual creditor, either by surprise or unfairness, from sacrificing the estate, or monopolizing its assets in satisfaction of his own debt. This is true in regard to creditors generally; but it is still more so with respect to *minors* and *sureties*. Of their rights and interests the courts are, very properly, exceedingly regardful and tender. In the latter class is the case now under review. Tripp was a mere surety, being a

guarantor of the payment of the bond and mortgage of Cunningham, who had become insolvent. He, too, was undoubtedly taken by surprise in the sale of the mortgaged premises in question. He was led, both by the complainant and the agent of Cunningham, to believe that the suit would be settled and paid by Cunningham. He understood from both, soon after the service of the subpœna on him, that an agreement to that effect had taken place between the complainant and Cunningham, by which the former was to receive, in payment of his claim, notes from the latter, who was then in good credit and possessed of a large real and personal estate. He, Tripp, acted upon this supposition, having heard nothing to the contrary until after the sale of the mortgaged premises, and the levying of an execution on his own property for the balance due on the bond. The decree against him had been taken by default, and he kept in ignorance of the proceedings, notwithstanding he resided in the same place with the complainant and was in the habit of seeing him almost daily. These proceedings, therefore, were matter of surprise, if not of unfairness, to Tripp. He became apprised of the sale only by the levying of an execution upon his property for the balance of the debt. Without any unreasonable delay, he offered the complainant, if he would consent to a re-sale of the mortgaged premises, to bid five times the sum at which the premises had been struck off to the complainant, and to pay all costs and expense of the sale and subsequent proceedings;and also, immediately on such re-sale, to pay the balance of the decree and costs, or to pay the amount of the whole decree and costs on condition that the complainant would assign to him, Tripp, that part of the mortgaged premises which he, the complainant, had purchased at the sale. This was a fair offer, and should either have been voluntarily accepted by the complainant, or enforced in equity. The complainant was entitled only to his debt and costs; with these he should have been satisfied.

1841. Tripp v. Cook.

The Chancellor himself seems so to have viewed it, for, in his opinion in this case, he says, "and perhaps this would be a proper case to interfere, as against Cook himself, if he had not shown that he had *good reasons* for holding Tripp to what otherwise might have been considered an unreasonable speculation at his expense." Now, these "*reasons*" which the Chancellor thus calls "*good*," were merely the allegations of the complainant, unsustained by proof, and contradicted by Tripp, that in another and entirely distinct transaction, viz: the purchase of certain property in Geneva, Tripp had wronged him. Can such *reasons*, upon any sound principle either of equity or justice, be called *good*, or be properly allowed to influence in any degree, a decision upon the rights and equities of the parties in the only case then before the court ? And even the Chancellor himself admits, that but for these reasons, the sale of the mortgaged premises, and their purchase by the complainant at the one tithe only of their value, "might have been considered an unreasonable speculation at his" (Tripp's,) "expense." And yet the Chancellor says: "I think that I ought not to disturb the sale, or to deprive Cook of the benefit of his speculation, *as a fair offsett for the injury he alleges he has sustained in the other transaction*." This decision seems to me as unsound in principle, as it is unsustained by the only authority upon which it was put by the Chancellor, viz: that of *McDonald* v. *Neilson*, 2 *Cowen* 190. Can the principle be for a moment tolerated, that in settling the rights and equities of parties in any given case, the court shall take into consideration, or suffer its decision to be influenced, by the mere allegations of one of the parties, contradicted by the other, and unsupported by proof, as to a pretended wrong sustained in another and entirely distinct transaction—a transaction not in litigation before the court, and of the allegations in relation to which by the one party the other party neither had due notice nor reasonable time to answer ? Shall the pretended equity in the one case, not before the

court, be received to balance the established equity in the other case, then the only one under consideration? and this, too, by way of "offsett" or set off! Against a clear equity shown in the case before the court, is to be set off a pretended equity in another case not before the court, and which has neither been liquidated by the parties, found by a jury, ascertained by arbitration, nor settled by the judgment of a court of law or equity. Even if the pretended equity arose in the same case, and could thus be properly taken into consideration by the court, it wants all the requisites essential to *set off;* not merely technical, but reasonable and proper. In the case of *The Executors of Robert T. Livingston* v. *John Livingston*, 4 *Johns. Ch. R.* 287, Chancellor Kent held, that "uncertain damages cannot be set off in equity any more than at law." Again, he says, "it is well understood, that uncertain and unliquidated damages are not a proper subject of *set off* in equity, any more than at law." *Id.* 292. Again, Chancellor Kent says: "There never was a case of *set off* in equity, where the damages proposed to be set off against a clear and certain debt, were unliquidated and depended upon an unsettled legal right of doubtful aspect." In *Duncan* v. *Lyon*, 3 *Johns. Ch. R.* 351, it was said, that "a court of equity follows the same rules as a court of law, as to *set off*. Debts must be clearly ascertained and liquidated." See, also, *Watts* v. *Coffin*, 11 *Johns. R.* 495. 2 *Id.* 150, 155. 3 *Caines* 84. *Ambler* 407.

All this would have been requisite, if the equity proposed to be set off, had arisen in the case before the court. But to undertake to settle the ascertained equity of a party in a case properly before the court, by off setting a pretended equity of the opposite party in another and distinct case, not then in litigation between the parties in any court, would seem to me to be a great departure from every sound and safe principle of equitable and judicial proceeding, and one which I can, in no respect, sanction by any vote to be given by me in this court. This seems to me too

1841.

Tripp v. Cook.

clear either to admit of question, or to require authority. In *James* v. *McKennon*, 6 *Johns. R.* 564, it is laid down as a rule, that "Every material allegation should be put in issue by the pleadings, so that the parties may be duly apprised of the essential inquiry, and may be enabled to collect testimony and form interrogatories, in order to meet the question." And in the case of *Stewart* v. *The Mechanics' and Farmers' Bank*, 19 *Johns. R.* 505, it was held as an undeniable principle, that the decree of a court of equity must be founded on some matter put in issue between the parties. It is bound to decide according to the allegations and proofs, as much as a court of law. In order to do what may seem to be justice, a court of equity can no more than a court of law, go out of the case litigated by the parties before the court, with a view to adjust and settle all the ascertained and pretended rights and equities between the parties. It can only decide upon those embraced and properly presented to the court, in the case under its consideration. A contrary practice would be as subversive of general principle, as it would be dangerous to the rights of parties. It is believed to be equally unsupported by any acknowledged authority.

The Chancellor says, that "The case of *McDonald* v. *Neilson*, in the court for the correction of errors, appears to be an authority for refusing to set aside this sale, on account of what had occurred between these parties in relation to the Geneva purchase." Let us, therefore, for a moment look at that case, and see if it sustains the position for which it is cited as authority. Even admitting the final decision in that case to be sound law, which may well be doubted, yet, unless I have greatly misapprehended both its facts and its principle, that case will be found, on examination, in no respect to countenance the doctrine and decision of the case now under review here. In *McDonald* v. *Neilson*, a bill was filed to set aside a bond and mortgage, alleged to have been obtained by oppression and coercion. The nominal consideration of the bond and mort-

gage was, 1st. A judgment against Neilson in favor of McDonald for $483.62; 2d. A balance of about $1,200 due on a judgment against Neilson's son in favor of McDonald; 3d. A note of Neilson's son of about $800, endorsed by J. Boyce to McDonald; and 4th. A general release of all demands by McDonald to Neilson and his son. Both the son of Neilson and Boyce were insolvent at the time. Chancellor Kent decreed that the bond and mortgage, having been fraudulently and unjustly extorted, should stand good only for the amount of McDonald's judgment against Neilson; and that, upon its payment within thirty days, they should be given up to be cancelled. This court reversed that decree, upon the ground that these securities had been deliberately entered into by Neilson, with a full knowledge of his rights, and with the advice of counsel. That they were executed to settle a legal controversy; and that, besides the judgment against Neilson, and the judgment and note against his son, a general release of all demands by McDonald against both father and son, formed a part of the inducement to their execution. It will thus be perceived, that the equity between the parties in regard to the diversion of the lumber, or the debt of Neilson's son, had become merged in the consideration of the bond and mortgage. It was part of the *res gestæ*, or of the subject matter of the application to the court. Not so in the case now under review. Here the equity claimed to be considered and set off, regarded an entirely distinct and different matter, neither properly put at issue, nor at all litigated between the parties. Without, therefore, impugning the law of the case of *McDonald* v. *Neilson*, it will be perceived that it in no respect, sustains or sanctions the doctrine or decision of the case now before the court.

I should, therefore, be in favor of a general reversal of the order of the Chancellor, if the premises in question still remained the property of Cook; but as he had already sold and conveyed them to Griffin previous to the motion in this case, it would, perhaps, be better not to disturb

that title, but to reverse the order of the Chancellor so far as it denies all relief and to direct that the purchase money on the sale to Griffin, deducting that paid by Cook, be applied towards the payment of the execution against Tripp; or, upon his paying within a reasonable time the execution and costs, that the contract of sale to Griffin, with all its benefits, except the $200 paid by Cook, and also the original decree against Cunningham and Tripp, be assigned to Tripp.

I shall, therefore, vote for a decree in conformity with these views.

On the question being put, *Shall this decretal order be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, and *Senators* ELY, FURMAN, HOPKINS, HUNT, H. A. LIVINGSTON, NICHOLAS, RHOADES, STRONG, VERPLANCK, and WORKS—11.

*In the negative:* Mr. Justice COWEN, and *Senators* DENNISTON, DIXON, JOHNSON, LEE, and SCOTT—6.

Whereupon the decretal order was reversed, and a new decree made, giving the appellant the benefit of the property sold by the respondent to Griffin to the amount of $1,000, the excess of the value of the property beyond the sum at which it was bid in by the respondent.