## MARCH *v.* LUDLUM and others.

Where there is a *dispute*, and one of the parties consults an attorney, solicitor or counsellor on the subject ; the communications between such party and his legal adviser are sacred, and the courts will not permit them to be divulged without the client's consent.

There *is à dispute*, when there are conflicting rights in existence, or claims made, to the same property ; which, unless abandoned by one party or the other, or arranged amicably, will terminate in litigation.

The privilege is not affected by the circumstance that the client offered no compensation, and the legal adviser did not make or expect to make any charge for his opinion.

It is highly important to the prevention of litigation, and indispensable to the administration of justice after it ensues, that the privilege of free and unreserved communication by parties with their legal advisers, should be preserved inviolate.

The court of chancery cannot set aside a public sale made by an officer who is not acting under the direction of the court, on the ground of the inadequacy of the sum bid by the purchaser, however gross or startling it may appear.

Nor is it a ground for relief against such a sale regularly conducted, that the party chiefly interested in attending upon, or preventing it, was ignorant that it was to take place ; even if the property sell for a twentieth part of its value.

A judgment creditor purchased the farm of his debtor, at a sale under the judgment. The farm was worth $3000, and was subject to a mortgage to the loan commissioners for $131, executed sixteen years before. The debtor ceased to pay the interest thereon after the sale, upon which the farm was advertised by the commissioners and sold and conveyed to L. a neighbor of the debtor, for $146. The creditor residing in a distant state, was ignorant of the existence of the mortgage until after the sale, as was his attorney who resided in the county. The sale was advertised according to the commissioners usual practice. The notice was published in a newspaper which had the greatest circulation in the part of the county where the farm was situated and was to be sold, and the notices were posted in the same part of the county. The attorney lived in a different section, where there were three newspapers of a much larger circulation. There were but five or six persons present at the sale. L. went with the debtor to the sale, and was urged by the debtor to buy the farm. After arriving he consented to buy it, and borrowed the money for the purpose at the place of sale. After the sale, he permitted the debtor to occupy the farm, the latter taking a lease. There was no proof that L. bought the farm for the debtor, or that any of the consideration was furnished by the debtor, or that either of them deterred or prevented others from hearing of or attending the sale. On a bill by the creditor to set aside the sale for fraud and unfairness, *held* that the sale was regular, and that it could not be set aside on the facts established. Also *held*, that after the sheriff's sale, there was no re-

lation of trust or confidence between the debtor and the creditor, nor any duty on the part of the former, which required him to apprise the latter of the impending sale, or precluded him from buying at the sale.

April 14, and May, 5; September 10, 1845.

IN 1825, Ephraim Wilcox, being the owner of a farm of one hundred acres in Romulus, afterwards Varick, in the county of Seneca, mortgaged it to the loan commissioners of that county, to secure the payment of $131, with interest annually. Isaiah W. Smith, in March, 1831, purchased the farm, subject to the mortgage.

On the 24th day of August, 1840, Enoch C. March, the complainant, recovered and docketed a judgment in the Supreme Court, against Smith with several others, for about $3000. At this time Smith owned the farm of one hundred acres; together with two other parcels of twenty-five and thirty-seven acres respectively, which two were mortgaged for their value.

On the 10th of April, 1841, these premises were sold by the sheriff, by virtue of an execution issued on the complainant's judgment and were purchased by him for $3166 68, being the amount of his execution and costs. The premises were not redeemed, and on the 11th day of July, 1842, they were duly conveyed by the sheriff to the complainant.

The interest on the mortgage to the loan commissioners was paid to the year 1840. In May, 1841, a year's interest remaining unpaid, the loan commissioners advertised the farm for sale pursuant to the statute, and sold it accordingly on the 21st day of September, 1841, to Stephen Ludlum, for $146 65, being the amount of the debt, interest and costs; and on the same day conveyed the farm to Ludlum.

Smith took a lease of the same from Ludlum, and continued in possession.

On the 17th day of November, 1842, the complainant filed the bill in this cause, against Smith, Ludlum, and John Sayre, the loan commissioner who acted in the sale, alleging that the sale was collusive and fraudulent, and praying to redeem the farm on paying to Ludlum the purchase money with interest and

L.'s expenses, or that the farm might be resold under the mortgage.

Among .other things, the bill alleged that all the judgment debtors were destitute of property, that the farm was a valuable improved one, with good buildings worth $3000, and more, and saleable for that sum, and there was no other fund out of which any part of the debt could be realized. That previous to the sheriff's sale, the complainant (who resided at St. Louis in the state of Missouri,) searched in the county clerk's office for incumbrances on the farm, and found none. On renewing the search in February, 1842, he for the first time received information of the existence of the mortgage to the loan commissioners, which he had never before suspected. A further inquiry led, in April 1842, to information of the sale to Ludlum. That on the 11th day of July, 1842, he tendered to Ludlum, the amount of the latter's bid with interest and expenses, which Ludlum refused to receive.

The bill further alleged, that shortly after the sheriff's sale, Smith called on Mr. Sayre and informed him that he, Smith, should no longer pay the interest on the loan mortgage, and wished him to advertise and sell immediately. That the commissioner advertised the premises as having been mortgaged by Wilcox, and the notice was published in the Ovid Bee, a newspaper printed at Ovid, Seneca county ; but the complainant is ignorant whether the advertisement was posted any where or not. That the Ovid Bee had a very limited circulation, confined to the vicinity of Ovid. That Seneca is a shire county, the courts being held alternately in the north and south shires. That in the north shire there were three newspapers published, each having a larger circulation than the Ovid paper. That there was no public conveyance from the north to the south shire, and but little inter-communication. That the great public thoroughfare to the West, is through Seneca Falls and Waterloo, towns in the north shire, from whence there is constant and rapid communication through the state. That the complainant's attorney resided in Waterloo, as did the complainant when in that county, which facts were known to the defendants. That the Ovid Bee

circulated but very little in the north part of the county, and a publication in it would not be likely to be noticed there.

The bill further stated, that the sale was made at the court-house in Ovid, pursuant to the advertisement. That Smith, Ludlum, and a person called in by them, were the only persons present at the sale. That Ludlum attended the sale for and at the request of Smith, and Smith or his friends furnished to Ludlum, the funds used at the sale or a part thereof, or borrowed the same of him. That the sale was procured by the contrivance of Smith, that Ludlum knew this, and assisted him in preventing publicity and keeping it from the complainant and all others, to enable Smith to buy the premises for himself in Ludlum's name. That divers persons were deterred from attending the sale by assurances from Smith or Ludlum, that the premises were to be bid off by Ludlum for Smith; and since the sale, they or one of them have stated that the purchase was for Smith's benefit who in fact owned the premises, and that the purchase money was loaned of Ludlum. The bill charged that the foreclosure was made at Smith's request, who consulted Sayre as to its mode and effect; that Wilcox's name was inserted to prevent publicity, and to enable Smith to have the premises bought for his benefit for the sum due on the mortgage, and thus to defraud the complainant; and that Ludlum bought the premises with Smith's money and for his benefit. The bill waived the defendants oath to their answer;—but it contained many special interrogatories, which accounts for portions of the answer hereafter stated.

The answer of Smith and Ludlum denied all the fraud, collusion and contrivances charged in the bill. It stated that Smith became insolvent by the failure of a bank in which he was concerned, and all his property was sold on execution in 1840, and early in 1841. He never expected to redeem his farm from the sheriff's sale, and was not able longer to pay the interest on the loan office mortgage. He called on Sayre and informed him that he could not and did not intend to pay the interest; his motive being, to save Sayre, who was an old man, the trouble of calling on him, which he supposed Sayre as an old neighbor and acquaintance, would do. That he did not ask Sayre to advertise or sell, or express to him any wish

in the matter, or consult with him on the subject; nor was the advertisement made or sale held by his procurement.   That Ludlum knew nothing of Smith's interview with Sayre.   That the Ovid Bee had a general circulation in the southern and central parts of the county, which has a north and south shire and jury districts ; and was the only paper published in the south shire, in which the farm was situated, and was the medium of all legal and other notices required to be published in that part of the county ; and was published in the county town for the southern shire.   That they were ignorant as to the circulation of the Bee in the north part of the county, and as to the circulation of the newspapers there printed.   That four persons besides the defendants, were present at the sale, one of whom was the county clerk whose office was in the court house, and whom Ludlum being in his office, casually asked to go up into the court room. The answer denied that L. attended the sale at Smith's request to buy the farm, or that L. or any one for him furnished the funds for the purchase; or that any persons were deterred by their assurances from attending the sale ; or that since the sale they have admitted that the purchase money was loaned of L.   Ludlum further answered, that he had heard that the farm was to be sold, but not the day of sale.   That he had engaged previously to go on the 21st of September, 1841, (the day of sale,) with H. Swan of Varick, to Lodi, a town next beyond Ovid, on business of Swan's, and was to ride in Swan's carriage.   That on the morning of the 21st, Smith rode up to L.'s house and told L. he was going to Ovid to attend the sale of his farm, and hearing L. was going to Lodi, which would take him through Ovid, asked L. to ride with him as far as Ovid, which L. did, as he would otherwise have had to walk to Swan's.   That Smith said nothing of any business, or intimated any wish, till after they were on their way, when after recounting his misfortunes, &c., he asked L. if he L. had not better buy the farm ; to which L. answered he could not, as he had not the means, and no more was said.   After arriving at Ovid, L. seeing few people there, and learning that Barna Van Vleet had come there prepared with money to bid off another piece of land advertised by the loan commissioners, but which he found was not to be sold, and that therefore Van Vleet would lend the

money to any one who wished to bid off Smith's farm ; applied to Judge Sayre and learned the amount due, and then and not before, resolved to bid on the property.   That he did this independent of Smith, without any request from him, and without any promise or expectation that S. or any one for him would repay the amount bid.   That L. borrowed the money on his own application, on his own credit, and for his own benefit, without any participation by any one else.   That he bid off the farm, paid the money down and received a deed from Sayre.   That the purchase was without any consent or understanding, by or with Sayre or any one else ; for L. himself, by his own act, and in his own discretion, and for the benefit of no other person.   That when the bill was filed, he was indebted to Barna Van Vleet in $153, for the money so borrowed, for which the latter held his note, dated the day of the sale but given afterwards, which note L. had paid since.   He never called on Smith to repay the money paid at the sale, and had no claim on S. therefor.   Smith, in his answer, stated the same facts.

The answer of Sayre set forth the mortgage, and the proceedings on it, to and at the sale and conveyance ; and that the advertisement was in the usual and proper form, detailing it, and was published and posted in the usual manner.   That the newspaper selected, had the principal circulation in the shire of the county where the lands advertised were situated, had been published several years, and was generally used for the publication of legal notices in the south jury district.   And he indignantly denied every charge and imputation in the bill, of fraud, collusion, consultation, &c. ; stating that he had simply done in the premises what the law required of him, without the least expectation or supposition that a fraud or injury to any person was to be effected thereby.

The cause was heard on pleadings and proofs.   The complainant proved by the evidence of his attorney, the searches stated in the bill, and the entire ignorance of both as to the loan office mortgage, till after the sale to Ludlum.   H. Swan testified to the arrangement for going to Lodi, and L.'s riding with Smith to Ovid, without at the time giving any explanation.   He proved that L. went with him to Lodi, as he had agreed.   Mr. Sayre,

examined his co-defendants, testified that on the day of the sale, just before it took place, Smith told him that Ludlum would bid off the farm. It was proved that Barna Van Vleet was at the sale, and that there was no bid but Ludlum's, who at once bid the amount due on the mortgage, including expenses.

James McKnight, for the complainant, testified, that in a conversation with Ludlum after the sale, he understood L. to say that he purchased the farm for Smith.

Mr. Bloomer, an attorney and counsellor at law, was introduced as a witness by the complainant, to prove statements made to him by Smith in the spring of 1842, relative to the loan commissioners' sale. It appeared that Smith, soon after he became Ludlum's tenant, called on Bloomer and consulted him in respect of Ludlum's title being a protection to Smith against the complainant; and the statements offered were made on this occasion.

The defendant's counsel objected to the testimony proposed to be given, on the ground that Smith's communication to Bloomer was privileged, and ought not to be divulged. The complainant insisted on the evidence, and the witness testified at large as to what took place between himself and Smith. When the cause came on to be argued, the defendants moved to suppress the deposition of Bloomer, and after argument upon the question, it was wholly suppressed, as will appear in the decision, *post.* This result makes it unnecessary to insert the testimony.

On the part of the defendants, it was proved that the Ovid Bee, in 1841, had been published for six years, and then had a circulation of 300 to 350, principally in the county of Seneca, and in the southern shire, in which it was the only newspaper. Four or five were taken in Waterloo, and ten or twelve in Seneca Falls. It was the medium of the publication of sheriff's sales, mortgage sales, and other legal notices.

Barna Van Vleet proved the cause of his attendance at the sale, Ludlum's application to him, and his loan of the money, as stated in the answer.

Some other evidence, it will be seen, is adverted to in the opinion of the court.

*O. H. Platt* and *J. L. White,* for the complainant, made the following points :

I. The sale under the loan office mortgage, was a fraud as against March. No rule can be made defining the limits of fraud, as each new rule would be followed by a new evasion, (Jeremy's E. Juris. 383 ;) and hence the authority of the court is not circumscribed, and it judges every case upon its own peculiar circumstances, (3 Bacon's Abridg. 299.)

Circumstances in this case which are the *indicia* of fraud.

1. John Sayre, the commissioner of loans, Ludlum, Smith, and Hanks, were the only persons present at the sale.

2. Smith and Ludlum were neighbors, they went together, notwithstanding Ludlum's promise to go with Henry Swan on business.

3. Ludlum was the only bidder, and he bid at once the amount of the mortgage.

4. The advertisement of sale was published in the "Ovid Bee," a paper of very limited circulation.

5. Smith continued to occupy the farm.

6. Smith went to the commissioner of loans, (Sayre,) with one Jared Van Vleet, to induce him to sell the farm under the mortgage; distance six miles, and they had no other business.

7. Smith informed Sayre in advance, that Ludlum would bid in the farm, (showing an agreement.)

8. Ludlum borrowed money of Van Vleet's son, who was there when the farm was sold. No note was given.

9. Admission of Smith to Bloomer, that it was fixed to be safe.

10. Admission of Ludlum to McKnight, that he purchased for Smith.

11. The price was grossly inadequate. The farm was worth $4000; and the amount paid was $146 65.

II. Where the circumstances of the case, or the situation of the parties, are such as to afford one of them power to take advantage of the other, and the price is grossly inadequate, the court will, at the suit of the injured party, rescind the transaction. (6 Har. & John. 435 ; 13 Vesey, 103 ; 16 ibid. 512; 4 John. Ch. R. 118, which is in point.) And the reason is, that suspicious cir-

cumstances, combined with inadequacy of price, make in equity, a case of fraud. (Jeremy's Equity, 397.)

III. When under a decree of foreclosure, property is fairly sold to a stranger, mere inadequacy is not sufficient to set aside the sale, unless it be so great as to be evidence of fraud or unfairness in the sale; (9 Paige Ch. R. 259, 261.) A case can scarcely be imagined, where the price could be more inadequate than in this; and *eight* " suspicious circumstances," independent of the relative " situations of the parties," combine with it to make a luminous case of fraud.

IV. The testimony of Jared Van Vleet is impeached not only by itself, but by circumstances detailed by other witnesses.

He was throughout the counsellor of Smith, gave direction to the whole proceeding to defraud the complainant, and his testimony is not to be relied upon.

V. The court have power to set aside the mortgage sale, and to order a re-sale, if fraud or unfairness characterize the first sale, and the complainant has sustained damage thereby, which would otherwise be irreparable.

*Edward Sandford,* for the defendants, made the following points:

I. The mortgage of Ephraim Wilcox to the commissioners for loaning money in the county of Seneca, was a valid lien upon the premises in question. It was not necessary that such mortgage should be recorded in the clerk's office of that county. The complainant had actual, as well as constructive notice of its existence. (5 Web. & Skin. Laws, 392; Laws of 1808; 1 Rev. Stat. 367, s. 52, 2d ed.)

II. By the non-payment of interest on this mortgage within twenty-two days from the first Tuesday of May, 1841, the loan commissioners became vested with an indefeasible estate in the mortgaged premises, the mortgage became *ipso facto* foreclosed by the default, and no title to the premises remained in the complainant under the sale made by the sheriff to him on the 10th April, 1841. A sale having been made subsequently, on the first of September, 1841, under the act, by the commissioner, no title vested in the complainant under the conveyance made by the

sheriff to him. (Laws of 1808, p. 367, § 11, § 15 ; 9 Johns. Rep. 129 ; 14 J. R. 360 ; 3 J. C. R. 338.)

III. The sale made by the sheriff to the complainant of the equity of redemption of Smith, conveyed to the complainant all Smith's interest in the mortgaged premises. He was neither legally nor morally bound to keep down the interest upon the prior incumbrances, he had not the means to do it, and the complainant knew his destitute circumstances. (*Prevost* v. *Gratz*, Peters' C. C. Rep. 378 ; *Jackson* v. *Woolsey*, 11 Johns. Rep. 446 ; *Fish* v. *Sarbe*, 6 Watts & Serg. 18, 22.)

IV. This court has no jurisdiction to entertain a bill to set aside the proceedings of the commissioner to sell, and in making the sale, on the ground of irregularity. (*Mayor of Brooklyn* v. *Meserole*, 26 Wend. 132.)

V. The only ground on which the court can entertain the bill is the alleged fraud and conspiracy between Smith, Ludlum and the commissioner, to sell and purchase the premises in question, without the knowledge of the complainant. Such fraud can only consist in the false representation of material facts ; or in the designed suppression or concealment of matters from the complainant, which the defendants were bound to have communicated to him ; and which misrepresentation or concealment have misled and deceived him to his injury. All fraud is utterly denied, and none is proved. (3 Term Rep. 51 ; *Pasley* v. *Freeman*, 6 Ves. Jr. 173, 183.)

VI. There was no fraud upon the complainant in Smith's omitting to pay the interest after the complainant had purchased his property nor in the loan commissioners proceedings to advertise and sell upon the non-payment of the interest according to law. There would have been no fraud upon the complainant had Smith himself become the purchaser at that sale. He owed neither debt nor duty to the complainant, and had the privilege of any other citizen to become a purchaser.

VII. Ludlum was a *bona fide* purchaser, and the complainant is not entitled to redeem from him. But had he purchased for Smith, or with his money, he would be entitled still to hold the premises. The complainant has no title or claim to redeem, nor was there any fraud upon the complainant in his becoming such

purchaser. (*Sherrill v. Crosby*, 14 Johns. Rep. 358 ; 4 J. R. 240 ; 1 R. S. 2d ed. 722, § 51.)

VIII. The fraud charged in the bill as against the complain- ant, is that notice of the sale was published in the *Ovid Bee*, to keep the complainant in ignorance of the proceeding. The answers deny the allegation of fraud, and the proofs show that this publication was the only one which could properly have been made.

IX. The fraud upon the law charged, that Smith and Ludlum deterred any person from attending and bidding at the sale, is utterly denied in the answers and wholly unsupported by proof.

X. The bill of complaint should be dismissed with costs.

THE ASSISTANT VICE-CHANCELLOR.—Before looking into the merits of this case, I will dispose of the motion to suppress the testimony of D. C. Bloomer. Mr. Bloomer was an attorney and counsellor at law, and Smith went to his office and consulted him, in regard to the probable validity of Ludlum's title against that of March ; Smith having taken a lease from Ludlum. The statements of Smith, which are sought to be proved by Bloomer, were drawn out from him by the inquiries which Bloomer made in order to advise him intelligibly. Smith offered no compensation, nor did Bloomer make or expect to make any charge for his opinion. But he was doubtless consulted because he was an attorney or counsellor, and no statement or inquiry would have been addressed to him, except for that cause.

Previous to this time, March had become the purchaser of the farm under his judgment, at a price so near its value, that no one was likely to redeem ; and it was morally certain that in July following, March would receive a sheriff's deed of the premises. Ludlum had already acquired an absolute conveyance of the same land, under the loan commissioners' sale. These two titles were hostile to each other, and could scarcely fail to result in a legal collision. Smith was interested in that result,·as a tenant under Ludlum, and on the assumption in the bill in this cause, still more interested as a participant in Ludlum's purchase. The bill was filed about eight months after the conversation with Bloomer.

The decisions, in this country, have been quite conflicting in regard to the extent of the privilege accorded to communications between clients and their legal advisers; and there has been no less disagreement in the courts in England. In this state, it has been held to extend to confidential communications between the attorney and client concerning the matter of the suit, or to which the retainer relates, where a suit is in contemplation. (See *Coveney* v. *Tannahill*, 1 Hill, 33.) There is no authority however which limits the privilege to the extent just stated.

In England, the tendency of the modern decisions has been to enlarge the privilege, and to carry out the principle upon which it is founded. The recent cases upon the subject are very numerous. I will content myself with a reference to a few of the leading decisions.

In *Walker* v. *Wildman*, (6 Madd. 47,) a motion was made for the production of letters which had passed between the defendant and her solicitor before the suit, in confidence, *in the usual course of business between a solicitor and client*. Sir John Leach, V. C., refused the motion; holding that the protection extended to every communication made by the client to counsel, or attorney, or solicitor, for professional assistance; and that it was not limited to such as were made pending an action or suit.

In *Vent* v. *Pacey*, (4 Russell, 193,) a letter which the defendant had written to his solicitor *after the dispute arose*, but before any suit, directing him to take the opinion of counsel upon the question in dispute; was held to be privileged by Lord Lyndhurst, Chancellor, affirming the order of the Vice-Chancellor.

In the previous case of *Hughes* v. *Biddulph*, (4 ibid. 190,) Lord Chancellor Lyndhurst decided that confidential communications between the defendant and her solicitors, or between the country solicitor and the town solicitor, made in their relation of client and solicitors, either during the cause, *or with reference to it*, though previous to its commencement, ought to be protected.

In *Greenough* v. *Gaskell*, (1 M. & K. 98,) Lord Brougham, Chancellor, in an able opinion examining the philosophy and true grounds of the privilege, declared his judgment that a solicitor cannot be compelled to disclose matters which have come

to his knowledge in the conduct of professional business for a client, even though such business had no reference to legal proceedings, either existing or in contemplation; and he affirmed the decision of the Vice-Chancellor which went to the same point.

In his subsequent decision in *Bolton* v. *The Corporation of Liverpool*, reported in 1 M. & K. 88, Lord Brougham again discussed the principle, and refused to order the production of cases which the defendants had prepared and laid before their counsel, in contemplation of the litigation. And he affirmed the decision of Sir Lancelot Shadwell, V. C., in the same case, (3 Simons, 467.)

In *Nias* v. *The Northern and Eastern Railway Company*, (2 Kean, 76,) Lord Langdale, Master of the Rolls, who has steadily resisted all extension of the application of the principle of this privilege, almost to the extent of pertinacity; considering himself bound by *Bolton* v. *The Corporation of Liverpool*, held a case to be privileged which the defendants had laid before their counsel, prior to the suit, but after the matters in dispute had arisen. When the case of *Nias* came before Lord Cottenham on the appeal from Lord Langdale, (3 M. & C. 355,) he expressed in strong terms his approbation of the decision in *Bolton* v. *The Corporation of Liverpool*, and of the principle upon which the privilege was upheld.

The principle was fully approved also, in *Knight* v. *Marquis of Waterford*, (2 Y. & C. 22, 30, 36,) by Lord Abinger, who thought however that the court in Bolton's case fell short in applying it to the extent that case called for. Lord Langdale in a prior case, *Storey* v. *Lord George Lennox*, had commented unfavorably upon Lord Brougham's decision; and the latest instance which I have seen of his ruling on the point, may be found in *Flight* v. *Robinson*, July 31, 1844; (8 Lond. Jur. R. 888.)(a)

To recur to the authorities which I proposed to cite, in *Herring* v. *Cloberry*, (1 Phill. R. 91,) Lord Lyndhurst, held the pri-

---

(a) Since reported in 8 Beavan, 22.

vilege to extend to all communications which pass between an attorney and client, in the course of business in which the attorney is employed professionally by the client. And to the same effect is his decision in *Jones* v. *Pugh*, (1 Phill. R. 96.)

In *Clagett* v. *Phillips*, (2 Y. & Co. Ch. Cases, 82,) Vice-Chancellor Knight Bruce, decided that where a dispute had arisen between two parties, which might, unless amicably adjusted, terminate in a suit, there if confidental communications with professional men passed in the course of the dispute, they would be privileged if litigation ensued, though litigation might not have been contemplated when the communications took place.

Vice-Chancellor Sir James Wigram, has in several instances had this subject under consideration, and has ably enforced the application of the privilege to all cases falling within its established principles.

In *Lord Walsingham* v. *Goodricke*, (3 Hare, 122,) written communications were held privileged from production, which passed between the defendant and his solicitor, before any dispute had arisen between the parties to the suit, so far as they contained legal advice or opinions. In that case the letters were written in relation to a sale, while negotiations for the sale and in regard to the title were proceeding, but before the date of the dispute. Wigram, V. C. says, it is now settled, that the communications between a party and his professional adviser may be privileged *where the solicitor is the party interrogated*, although they do not relate to any litigation either commenced or anticipated.

In *Woods* v. *Woods*, (4 Hare's R. 83 ; S. C. 9 Lond. Jur. Rep. 102, and 615,) the defendant in order to sustain a defence upon the lapse of time and the complainant's acquiescence, filed a cross bill alleging the facts, and that the opposite party, fifteen years before, had taken the opinion of counsel thereupon, and he set forth the alleged case and opinion. The answer of the defendant to the cross bill, admitted that he had taken the opinion of Mr. Bell on his title, (which was the subject of the suit,) about fifteen years before, and that the case and opinion were in his possession ; but he submitted that they were privileged communications between himself and his counsel, and that he was not bound to produce

them. The production of the opinion was insisted upon, because the case and opinion were prepared and taken, before the dispute in the cause had arisen, and not with reference to any pending or expected litigation. Sir James Wigram, referring to his judgment in *Lord Walsingham* v. *Goodricke*, refused the motion for the production of the opinion.

Finally in *Holmes* v. *Baddeley*, (Nov. 25, 1844, 9 Lond. Jur. Rep. 289,)(*a*) the complainant claimed as sole heir at law of S. H., and the defendants claimed also as her heirs, disputing the legitimacy of the complainant. The bill charged that the defendants had in their possession, cases, opinions, letters, &c., on the subject, which the bill required to be produced. It appeared that soon after S. H.'s death, one A. H. set up a claim as her heir, adverse to the defendants. They thereupon laid two cases before their counsel and obtained opinions, and several letters passed between their solicitors and different persons, respecting their right to the property. The opinions and correspondence were obtained and carried on, in contemplation of legal proceedings against A. H. Some of the letters &c., were written before A. H. made her claim, but after the defendants were apprised of her intention to make it. They contended that the documents were privileged, and so Lord Lyndhurst decided, reversing Lord Langdale's order (reported in 6 Beavan, 521,) made for their production.

These authorities satisfactorily establish that where there is *a dispute*, and one of the parties consults counsel on the subject, the communications between them are sacred, and the courts will not permit them to be divulged without the client's consent.

The opinions of several eminent equity judges go beyond this, and extend the privilege to professional inter-communications in regard to professional business, without reference to any dispute.

And the cases show that there is a dispute, where there are conflicting rights in existence or claims made to the same proper-

(*a*) Reported subsequently in 1 Phillips, 476. And see a more recent adjudication on the subject, in *Carpmael* v. *Powis*, before the Master of the Rolls, November 8th, 1845, and before the Chancellor, March 25, 1846 ; now reported, 1 Phill. R. 689, and 15 Law Journal, N. S., Chancery, 275.

ty, which unless abandoned by one party or the other, or arranged amicably, will terminate in litigation.

The point before me is clearly within these authorities. The dispute was already in existence when the communications were made, and it ripened into a suit in a few months afterwards.

It is highly important to the prevention of litigation, as well as indispensable to the administration of justice after it ensues, that the privilege of free and unreserved communication by parties with their legal advisers, should be preserved inviolate. And I have no hesitation in adopting the principle of the equity cases which I have cited, in its application to the testimony of Bloomer.

The motion to suppress his deposition is granted.

Next, in regard to the merits of the cause. The case is one of very great hardship for the complainant, if it be remediless ; a hardship against which the court would fain grant relief, if consistent with established principles of law, and with rules of property which are important to be preserved.

The bill makes no specific charge of *irregularity*, in the sale by the loan commissioner. It alleges the complainant's ignorance as to the posting of the notices required by law, and asks a discovery on that point. But it is plain that error or irregularity was not intended to be alleged as a ground for setting aside the sale ; and I may dismiss that subject by saying that there is no irregularity established.

The gravamen of the bill is, that there was a gross and startling inadequacy in the sum bid at the sale ; and that the sale itself, the price bid, and the purchase by Ludlum, were the result of a contrivance between Smith and Ludlum, aided by the collusion of Mr. Sayre, the loan commissioner, and designed to defraud the complainant for Smith's benefit.

To examine these allegations in detail. 1. As to the inadequacy. This is unquestionably very great, for the property sold for less than one-twentieth of its value.

But I do not understand that the court of chancery, can on this ground alone, set aside a public sale made by an officer who is not acting under the direction of the court. Instances of greater inadequacy, are of constant occurrence in sales for taxes

and assessments, made by our state and municipal authorities. The exercise of such a jurisdiction, would, I imagine, be more startling to the public mind, than any supposable inadequacy of price, would be to the mind of the court. Over judicial sales, made by its own officers, the court of chancery has always exercised a summary control, by motion or petition. But even in those cases, the court will not interfere, on the ground of inadequacy alone. (*American Insurance Company* v. *Oakley*, 9 Paige, 259; *Brown* v. *Frost*, 10 ibid. 243; *Tripp* v. *Cook*, 26 Wend. 143, 156, 159.) There must be some surprise, accident, fraud, or similar cause, other than the neglect of the party interested, or his inability to raise the money; to induce an order for a re-sale when the sale has been made by its own officers, and under its own process or decrees. Under any other rule, confidence in such sales would be entirely dissipated, and the final result would be, that creditors would become the purchasers upon their own terms. (And see 1 Story's Eq. Jur. § 245.)

The point of inadequacy was urged in connection with the other facts, as evidencing fraud; and I will recur to it in that connection. Standing by itself, it furnishes no ground for relief. Before considering the circumstances of this sale, I will advert to the statute under which it was made. It is to be found in the Session Laws of 1808, chap. 216; (5 Vol. Laws, Webster's ed. 392.) By the 15th section, if any borrower neglected for twenty-two days after the first Tuesday in May in any year, to pay the yearly interest to the commissioners, they became seised of an absolute, indefeasible estate in the lands mortgaged to them, and the mortgagor, his heirs and assigns were foreclosed of all equity of redemption therein. Within eight days after they became thus seised, the commissioners, by section 16, were required to advertise the lands to be sold on the third Tuesday of September ensuing. On that day, the statute required them to expose such lands for sale at public vendue, and to convey them to the highest bidder, who thereby acquired an absolute title to the same. If no one bid as much as remained unpaid on the mortgage, the commissioners were to take possession of the lands for the benefit of the state.

2. Having these enactments in view, there is no pretence upon

the evidence, to charge Mr. Sayre with collusion or connivance with the other parties. It was his imperative duty to advertise the land, on the non-payment of the interest. Whether Smith begged him to do this, or to omit it, he had no discretion to pursue any other course. He advertised it in the manner which had been his custom, for more than thirty years that he had acted as commissioner; he selected the newspaper and the places for posting the notices, which were the most likely to give general notice in the vicinity of the lands advertised; and he made this selection, without any concert or consultation with the other parties, and without their knowledge. The cases of *King* v. *Stone*, (6 J. C. R. 322,) and *Jackson, ex dem. Warden*, v. *Harris*, (3 Cowen, 241,) show that the publication and posting of the notice of sale are sufficient.

When the day of sale arrived, he made the sale in the accustomed place, the court room in the court house. He had no right to adjourn the sale, or to refuse Ludlum's bid, and if he had declined to execute a deed to Ludlum, the Supreme Court would have compelled him to do it.

He knew nothing of the complainant's interest in the matter, and he simply discharged his duty as a public officer, without turning to the right hand or to the left.

3. The next inquiry is into the fraud and contrivance of Smith and Ludlum; and in pursuing it, I will take up the circumstances on which the complainant relies, in the order of time.

The first was Smith's going to Mr. Sayre, to tell him that he should not pay the interest any longer, and requesting Sayre to advertise and sell immediately. There is no proof of any of this charge, except that Smith went to Mr. Sayre and told him the farm had been sold, and he, Smith, should not pay the interest. This is urged as a suspicious proceeding. If it could have accelerated the sale, or in any manner influenced it, the visit to the commissioner might have been deemed singular; but it could not and did not have the slightest effect. The statute was the inflexible guide of the commissioner. Mr. Sayre says, that he would probably have notified Smith before proceeding to advertise; and Smith's explanation that he went to save Mr. Sayre from that trouble, is the most probable that has been suggested.

The next *indicia* of fraud relied upon, are found in the manner of advertising the sale. As this was the act of the loan commissioner, without any participation or even knowledge, on the part of either Smith or Ludlum, it is not imputable as a fraud to them. I have already expressed my opinion that the mode of publishing and posting the notice of sale, was proper and sufficient.

Next in order, is the fact that Ludlum rode to the place of sale with Smith. It certainly is not surprising that Smith should go to the sale, or that he should prefer to have his farm bought by a neighbor, to having it fall into the hands of an entire stranger. Nor is it to be doubted, that he hoped and expected, if a neighbor did buy it for a small sum, that he would at some day be permitted to purchase it back on moderate terms. In this, he neither hoped or expressed any thing improper, and he went to the sale as every bidder does who attends an auction, with a desire to obtain a cheap or advantageous bargain; which precisely as it equals his expectations, redounds to the disadvantage and loss of others interested in the subject matter of the sale. Instead of this being deemed wrong or improper, the law regards it as fair, and rather to be encouraged, so long as there is no combination to prevent competition, or other fraudulent practice respecting the sale.

Smith had no interest to prevent the sale of the farm. His title to it was effectually divested by the sheriff's sale; not that the time for redemption had expired, but the bid was nearly or quite equal to its value, and he was insolvent and had no means with which to redeem.

It was not his duty, as between him and the complainant, to pay the interest; (*Russell* v. *Allen*, 10 Paige, 249, 255.) And he was under no greater obligation to notify the complainant of the impending sale on the mortgage, than any one who intended bidding at a master's sale would be bound to notify a person having an interest in the property, whose attendance at the sale might interfere with his proposed speculation.

In short, Smith's attitude towards that of the complainant was not that of duty, trust or confidence. He stood at arms length. The complainant had satisfied his debt by the sale of the farm.

CASES IN CHANCERY.

The farm was in effect his, and Smith had as perfect a right to buy it in on an old mortgage, as he had to buy any farm of the complainant's in which he never had an interest.

It is to be observed too, that there is no evidence of Ludlum's having any idea whatever of buying the property or even attending the sale, until the morning it took place. On the contrary, his answer to the bill in this respect, is that he entertained no such intention. The ride to Ovid furnished an opportunity to concoct a conspiracy; but there had been abundant time for that purpose three months before, if any were in view. The mere fact of riding in the wagon with Smith, instead of riding to the same place with Swan, if it proves any thing of the conspiracy, proves that Smith had not previously arranged it. If the matter had been understood before, Ludlum would naturally have gone with Swan. But the circumstance is fairly explained. Ludlum had an engagement for Swan, which would take him through Ovid; made without any reference to the sale. He was to go with Swan, but Smith came by his house with a wagon, and Ludlum instead of walking a mile to get into Swan's wagon, took a seat with Smith, and rode all the way to Ovid. It was not quite so near a route for Smith to go by Ludlum's, and it is probable he went that way in order to urge Ludlum to attend the sale and buy; for it is conceded that he did so urge him while on the way. It is alleged that Ludlum then agreed to buy, and to buy for Smith's benefit. Both facts are positively denied, and there is no evidence against the answer. Nor is there any proof that Ludlum made up his mind to bid, until after he came to Ovid, and the direct assertion to the contrary in his answer, is sustained by the fact that he had no money with him, and did not know that he could borrow any, until the hour of the sale.

Allied with this, is the circumstance that Smith informed Mr. Sayre a few minutes before the sale, that Ludlum would bid off the property. This was also cited as evidence of an agreement to buy for Smith's benefit; but the impression of Sayre does not go so far as that, and if it did, it would be no evidence against Ludlum.

I will also advert, in connection with this, to the next point

made, that there were only three persons present at the sale, besides the officer, viz : Smith, Ludlum, and Mr. Hanks, whom they requested to attend. This point is not proved. The answer states that there were at least four others present, and the witnesses mention the names of two.

It is alleged in the bill, that divers unknown persons were deterred from attending the sale by assurance from Smith or Ludlum or both, that the land was to be bid off by Ludlum for Smith. This charge embraces the circumstance that Smith so informed Sayre, and the whole charge is pointedly denied in the answer. The attempt to prove an opinion or impression of Mr. Sayre, failed ; and it could not overcome the force of the denial. The argument upon the absence of bidders, founded upon these circumstances, therefore has no basis, and falls to the ground. I agree with the complainant's counsel, that if Smith and Ludlum had prevented purchasers from going to the sale, or persons in attendance from bidding, it would have been a fraud on the complainant. But I can discover no proof that they attempted to do either. I cannot derive that proof from the absence of bidders. It is a frequent occurrence in judicial sales in the country, that no one attends except the creditor or his agent.

Another badge of fraud is made of the facts that no one bid at the sale, except Ludlum, and he bid at once the amount of the mortgage. The latter fact, which was so much dwelt upon, is readily explained. He probably knew that by the statute, the property could not be sold to any person, for less than that amount.

With the fact of his being the only bidder, I will take another which was pressed very hard, viz. Ludlum's borrowing the money of Barna Van Vleet, who was present at the sale, and who took no note for the loan. The bill charges no fraud or collusion on Van Vleet, so that his loaning $150, to Ludlum, and trusting him several months without a note, are of no weight. But it is deemed extraordinary that Van Vleet, with the money in hand, did not bid. It is proved that he came there to bid on another parcel advertised by the commissioner, which had been redeemed before the sale. Whether he came for a speculation or otherwise, it does not appear. He did not intend to bid on Smith's land, and

instead of bidding, he let Ludlum have the money for that purpose. Thus it seems he did not want the speculation, and that suffices. The money could not enable both to bid, and I do not see how the amount of the sale would have been enhanced, if Van Vleet had bid instead of Ludlum.

I now come to the inadequacy of price urged in connection with all the foregoing circumstances. But as each of those has proved to be unfounded or unimportant, the argument derives no additional force.

It was said there were peculiar relations between the complainant and these parties. This is a mistake. There was no relation between them, which inhibited either Smith or Ludlum from buying the farm for $146, or even a less sum, if they could.

Most of the authorities cited on this subject, were cases of specific performance where a court of equity declined to interfere because of inequality in the contract, or where the court relieved because undue advantage had been taken of situations of confidence or duty. They have no application to public, statutory or judicial sales, made to bidders not affected by any duty, trust or fraud.

Two other circumstances remain to be noticed; the admissions of Ludlum that he purchased for Smith's benefit; and Smith's continuance on the farm. Whether he did or not so purchase, is of no consequence to the complainant, as a ground of relief. (*Sherrill* v. *Crosby*, 14 Johns. 358; *Botsford* v. *Burr*, 2 J. C. R. 405.) The fact, however, is pressed to raise the inference of combination between them, to enlist sympathy and stifle competition at the sale.

The fact is positively denied by the answer, and the testimony of McKnight is too indefinite to prove its existence.

As to the possession of the farm, in which Smith remained when the testimony was taken in August, 1843. From May 1, 1842, he was under a lease and liable to rent. If Ludlum had turned Smith out of possession the spring succeeding his purchase, the whole country would have cried out upon his cruelty. He had a perfect right to do it, and no tribunal on earth could have prevented it. But it is not to be used to deprive him of his rights, that he has not exercised them to their utmost extent. An entire

stranger to Smith, buying for such a price, would doubtless have been equally lenient. As Ludlum is a neighbor of Smith, I may suspect or even believe, that he feels sympathy for him, and intends to restore the farm to him ; but neither the suspicion or the belief, will warrant me in charging him with fraud in its purchase under the circumstances proved in this suit. In the case of *Denning* v. *Smith*, (3 J. C. R. 332,) relied on by the complainants, the sale was irregular and void for non-compliance with the statute ; and Chancellor Kent deemed the evidence of abuse of trust on the part of the commissioners, so strong, as to be indicative of fraud. It resembled this case only in one point, the small amount of the bid in reference to the value of the property, and that point was not dwelt upon by the Chancellor. *King* v. *Stow*, (6 J. C. R. 323,) was more like this case. The land was sold for one-seventh of its value, and Mr. King who was its owner by purchase at a sheriff's sale, was ignorant of the existence of the loan office mortgage ; yet the sale was sustained by Chancellor Kent.

Upon the whole, I am unable to find any warrantable ground for interfering with this sale. The cause of the grievous loss which the complainant encounters, is not the defendants' fraud or inequitable conduct. It is rather his own neglect to ascertain the true situation of the property. Mortgages to the loan commissioners, were a species of lien of more than thirty years standing, and readily to be found in the county clerk's office. The law charged him with notice of the existence of this mortgage, and if he had no actual notice, it is not the fault of the statute which created the lien. It is a misfortune from which he cannot be relieved, without overturning established principles, and inflicting a greater public injury than can be made up by the remitted hardship of this case.

The bill must be dismissed, and the complainant must pay the costs of Mr. Sayre. I think under the circumstances, that the complainant ought not to be charged with the costs of the other defendants.