HORATIO HILL, Complainant, Appellee,

vs.

JACOB A. HOOVER, EBENEZER B. NELSON and WILLIAM NELSON, Defendants, Appellants.

APPEAL IN EQUITY FROM MILWAUKEE CIRCUIT COURT.

The statute (*Rev. Stat. ch.* 98, § 65) renders the affidavit of the printer, or foreman of such printer, of any public newspaper published in this state, of the publication of any notice or advertisement, required by law to be published in such newspaper, admissible in evidence, and *prima facie* evidence of the facts stated therein.

To be admissible as evidence, such affidavit must be in strict conformity with the statute; must be made by the printer, or foreman of the printer, of the newspaper in which the notice is published.

The fact that the affiant, in an affidavit of publication of notice, is the printer, or foreman of the printer, of the newspaper in which the notice is published, is material and indispensable, and must be directly affirmed and sworn to, not stated by way of recital.

Where an affidavit of publication stated by way of recital, "A. B. foreman, &c., being duly sworn, deposes and says, that the notice, &c., was published, &c.;" it was held that the affidavit was insufficient, in that the affiant did not swear that he was the foreman, &c.

Where in a foreclosure suit, the affidavit of publication of notice of sale was defective in not directly stating the fact that the affiant was the foreman of the printer, or printer, it was held that this defect did not necessarily invalidate the sale, but only the order of confirmation.

Where a sale of the mortgaged premises was advertised at 2 o'clock P. M., and was bid off by the solicitor of the mortgagee, for the benefit of the latter, and on the same afternoon, within about two hours after the hour fixed for sale, the defendant appeared at the place of sale, and met the solicitor of the mortgagee, and *offered to pay the whole amount of the mortgage debt, interest and costs*, which was refused by the solicitor, who referred the defendant to the mortgagee, and immediately proceeded to file report of sale and procure confirmation thereof; Held, that the sale should stand.

As to surprise, opening of sales, &c., &c., see case.

SMITH, J., dissenting.

THE appellee and complainant below, filed a bill of foreclosure in the Circuit Court of Milwaukee county, on a note given by defendants, Ebenezer B. Nelson and William Nelson, and on a mortgage executed by the Nelsons, on the thirteenth day

of June, 1855, and a subpœna was issued returnable on the twenty-seventh day of June, 1855. The subpœna was served on the fifteenth day of June, on Edward B. Nelson and William Nelson, and returned on the 15th. On the 2d of July an order was entered requiring Ebenezer B. Nelson and William Nelson to plead, answer or demur by the 2d day of August, A. D. 1855. On the 26th of July, 1855, a subpœna was issued for appellant, returnable August 7th, 1855; which was served on the 27th of July, 1855, and returned on the same day. On the 7th of August, 1855, an order taking the bill as confessed by Ebenezer B. Nelson and William Nelson, was entered. The bill was amended by making the appellant a party, and on the 8th of August, 1855, an order was entered requiring the appellant to answer by the 8th of September. On the 10th of September, an order was entered taking the bill as confessed by appellant. On the 19th of September, 1855, the usual decree of sale was made for $1,089.44, and $30 solicitor's fees, directing the sale of the mortgaged premises, to wit: lot seven (7), in block seventy-four (74), in the Fourth Ward of the city of Milwaukee. On the 3d day of November, A. D. 1855, the sheriff filed his report of sale, setting forth that he sold the premises on the 3d day of November, 1855, after having advertised previous to the sale at least once in each week, for six successive weeks, to Jerome R. Brigham, for $1,138.06, the same being the amount of the decree and costs. And on the same day, the 3d of November, an order of confirmation was made. On the 7th of November, the appellant filed his motion as follows:

"And now comes the said Hoover, one of the defendants in said cause, by Brown & Ogden, his solicitors, and moves the court that the order of confirmation and sale, in the above entitled cause, be set aside, and that he be permitted to pay the amount of said decree, interest and costs (which amount the said Hoover is ready, and now offers to pay), for the reasons following, to wit:

"1st. Because the proceedings in said cause were irregular, and the notice of sale was insufficient.

"2d. Because no notice was served upon the said Hoover of any of the proceedings in said cause.

"3d. On account of surprise, and for other causes shown in his affidavit herewith filed.

"4th. For the reason that said property described in said bill, is worth greatly more than the amount for which it was sold, to wit : four thousand dollars."

Which was based upon the following affidavit :

[*Venue, &c.*] "Jacob A. Hoover, being duly sworn, deposeth and saith, that on or about the 1st day of August, 1855, he was served with a subpœna in the above entitled cause, and shortly afterwards called upon the complainant, and informed said complainant that he was the owner of said property described in the bill of complaint in said cause, to wit: lot No. 7, in block No. 74, in the Fourth Ward of the city of Milwaukee; that he was surprised, considering their relations, that the mortgage should have been foreclosed without notice to himself (said affiant), and that he was ready to pay up and settle the matter; but claimed that, considering the circumstances, he (said Hill) ought not to require more than the one-half of the solicitor's fees secured by the mortgage, as affiant had always been ready to pay. And affiant further states that said Hill said this affiant must pay the costs, but he (said Hill) was then going east, and this affiant could fix up matters after his return. This affiant further says that said conversation was on Saturday, after bank hours, and that he expressly stated that he would settle the amount and costs on the next Monday, when said Hill stated that he was going east as aforesaid; that this affiant has from that time always been ready and willing to pay the amount of said mortgage, costs and interest, and understood that said Hill desired that it should be settled as aforesaid after his return, and that no advantage of this affiant should be taken for that reason; that this affiant did not afterwards see the said Hill, except in a buggy passing, until after the sale made in said cause; that, relying on the understanding aforesaid, and on his declared wish to pay, this affiant did not employ a lawyer, nor watch said proceedings in said court, and was utterly ignorant of the order to answer the decree and the publication of notice of sale until

after said sale; that a few moments after the sale he was informed by Mr. Bade of the fact, and immediately proceeded to Wells and Brigham's office, and Mr. Wells told him that said Brigham attended to the matter, and was then at the court-house, whither this affiant forthwith proceeded, and arrived there within from one-half to one hour of the said sale (as affiant is informed), and finding said Brigham there, offered to pay the amount of the decree, interest, costs, &c., being the amount bid for said premises on said sale; that the said Brigham replied that he had bid in the premises in his own name, but for the benefit of said Hill, and presumed there would be no difficulty, but he must first see said Hill; that this affiant went, on the Monday following, and saw said Hill and made the same offer to pay, and requested that said property might be restored, when said Hill replied he could not answer then, but would answer in the afternoon; that said affiant endeavored to find said Hill in the afternoon of that day, but did not succeed—this affiant believing that he purposely kept out of the way; that on said Monday said Brigham told this affiant that he had already conveyed to said Hill, but subsequently informed me that he made the statement for the purpose of forcing said Hill to take the responsibility; that on Tuesday evening following, this affiant succeeded in finding said Hill again, when he informed this affiant that he could do nothing then, but would see; and this affiant further saith that he is the purchaser of said premises from said Nelson, and that they are, and were at the time of said sale under said decree, worth $4,000; that he is informed that in the return of the said subpœna to himself (the same having been served on about the 1st day of August, aforesaid), and in taking orders and in publication, the shortest legal time was allowed, and no time elapsing between the different steps, the whole thing was forced through with extraordinary celerity; that the first publication of notice of sale was even on the same day with the decree, and that said decree was not taken upon any regular call of the chancery docket, but during the trial of jury causes. And this affiant further shows that his delay in payment of said sums, and his neglect to watch the said case in court, were owing to his reli-

ance upon the good faith of said Hill; that he always has been ready and willing as aforesaid, and is now ready and willing to pay the amount of the mortgage, interest and costs, and that by said decree and sale in said cause he has been taken by surprise, and is greatly wronged and injured in the premises."

Sworn, &c.

On the 7th of November the following order was made:—

"*November 7th*, 1855.

"On reading and filing the affidavit of the defendant Hoover, and the motion of said defendant, by Brown & Ogden, his solicitors, it is ordered by the court, that the order of confirmation entered in this cause be and is hereby vacated and set aside, and that the parties have leave to be heard at a future day."

Afterwards the following affidavits were presented:—

"Jerome R. Brigham, being duly sworn, says that he is a solicitor in this cause; that he was present at the interview between the complainant Hill and defendant Hoover, spoken of in the affidavit of Hill, and that in that conversation Mr. Hoover inquired of this deponent the probable time it would take to get a decree against him, said Hoover, in this cause, for the purpose, as this deponent then understood, of determining whether it was better to pay up at that time or to let it run till he was compelled to pay by decree. This deponent then informed said Hoover that there would probably be a decree in September following, and otherwise generally stated to said Hoover the time that would probably be required for the several steps before sale as nearly as he could, which this deponent believes did not vary much from the time actually taken."

Sworn, &c.

"Joseph F. Hill, being duly sworn, deposes and says, that at the request of his brother, the complainant in the above entitled cause, during the week ending August 11th last, he went once or twice to the mills of said defendant Hoover to urge upon him a settlement of the matter on which the above suit was brought;

that on Saturday forenoon, as early as 10 o'clock as deponent believes, this deponent found said Hoover, and said Hoover agreed to meet the complainant in this cause at the office of Wells & Brigham, at two o'clock of that afternoon, Saturday, August 11th last, to close up the matter. Said Hoover at that time stated to this deponent that he had no money with which to pay the amount that day; and this deponent told said Hoover that he could give his check, dated in advance, which could be used by the complainant, who wanted to start east the next day, or early the day after."

Sworn, &c.

"Horatio Hill, being sworn, says that he is the complainant in the above entitled cause lately pending in said court; that in the afternoon of Tuesday or Wednesday, August 7th or 8th last, he met Mr. Hoover, one of the said defendants, at the Cold Spring House a short distance out of the city of Milwaukee, and had a conversation with him, said Hoover, relative to the above entitled cause which was then pending. He, Hoover, said to this deponent that he was willing to pay up the amount due on the mortgage to foreclose which said suit had been brought; and that he, Hoover, would the next day come down to the office of this deponent and pay and settle up the matter, to which arrangement this deponent was most anxious to accede, as this deponent was at that time in need of the money; and said Hoover stated that he had no desire to put this deponent to any trouble in the matter, and wished himself to avoid costs. This deponent further says, that said Hoover did not come to the office of this deponent as he had agreed to do, and this deponent being anxious to obtain the money sent his brother, J. F. Hill, to find said Hoover and urge upon him to come down and settle as he had proposed; that his brother failed to find said Hoover until the Saturday following, as he informed this deponent: but as he informed this deponent, did on that day in the forenoon find Mr. Hoover and obtain from him, said Hoover, a promise to meet this deponent for a settlement, at the office of Wells & Brigham, who were the solicitors of this deponent in the matter, at 2 o'clock of that afternoon. And this deponent further says, that

agreeably to said appointment, he met said Hoover at the office of Wells & Brigham, on Saturday, August 11th last, at just about the hour of two in the afternoon. This deponent further says that his recollection of the time of the meeting is clear and undoubted; that said Hoover proposed to settle by paying the amount of the note secured by the mortgage and one-half of the costs; that this deponent told said Hoover that he, this deponent, must have the whole amount of the note and the costs, and refused to settle on any other terms. Said Hoover then said that money was worth twelve per cent. to him, and that he, said Hoover, believed that he could make as much on the money as the costs would be if he let the suit go on, or words to that effect. Said Hoover then afterwards said that he had not the money with which he could pay the note then, and he should be obliged to see if he could raise it. This deponent then stated to said Hoover, that he, this deponent, was to start for Buffalo the next day or early the day after, and that it must be fixed that day (Saturday) to be of any use to him, deponent. Said Hoover said that that was impossible, and that the matter must be left till the return of this deponent, and so the conference ended; and this deponent went away with the impression, from the conversation, that said Hoover chose to keep the money till a decree could be obtained and pay the extra costs, and directed his (this deponent's solicitors) to press the suit as fast as possible, that he, this deponent, might get his money as soon as it could be had. This deponent further says, that he returned from Buffalo in September last, and has since been all the time in and about the city of Milwaukee; that he has frequently since seen said Hoover in the streets, but has never received from him any proposition to pay the amount due on said note (which with his costs and reasonable expenses, this deponent would have been glad at any time to have received), until after the sale of the premises mortgaged under the decree of the court, and the confirmation of such sale and a deed of the property. This deponent further states, that he has paid besides and in addition to the taxed costs in the suit, the sum of fifty dollars to his solicitors for their services, and the

sum of one dollar and fifty cents for record of sheriff's deed and of deed from Brigham to this deponent.

"This deponent further says, that he is advised and believes that the foreclosure above entitled was conducted with no celerity beyond what is prescribed by statute, and the rules of chancery proceedings in this court, although this deponent says that it was his own intention, and he supposes that of his solicitor, to enforce payment of the amount secured by mortgage and the costs thereon, at the earliest possible day, this deponent being especially instigated thereto by the determination understood to have been expressed by said Hoover at the interview before mentioned, to leave this deponent to his regular course of proceeding in chancery to obtain his money, he, said Hoover, choosing to pay costs rather than lose the use of his money by a settlement at that time. This deponent further says, that it is the general understanding and report among men who did business with the late firm of Nelson & Co., and this deponent himself fully believes, that said defendant Hoover was a partner in said firm of Nelson & Co., and this deponent believes, though of this he has no certain knowledge, that said Hoover acquired his title to the lot in question in this cause by means of and through his position as such partner of the other defendant, Nelson; and this deponent further states, that before the failure and breaking up in business of said firm of Nelson & Co., they were indebted to this deponent in the sum of four hundred 50-100 dollars for money lent; for which sum, and interest on the same, amounting to four hundred and twelve dollars or thereabouts, they gave their note, signed Nelsons & Co., which note this deponent still holds wholly unpaid and due. And this deponent further states, that although he is advised and believes his own title to the lot in question to be absolute and perfect; still, in consideration of the circumstances, he has felt willing to make a fair settlement of the whole matter with said Hoover, and has offered to said Hoover, through his attorney, to convey said lot to said Hoover, upon his, said Hoover's, paying to this deponent the full amount of said decree and all his, said deponent's, expenses about the matter above stated, and also the amount due on said note of Nelsons

& Co.; which offer said Hoover through his attorney declined to accept."

Sworn, &c.

And on the 22d of November, the motion having been argued, the following order was made:

                                    " *November* 12*th*, 1855.

" And now come the parties by their solicitors. Thereupon it is ordered by the court that the said order of November 7th, 1855, entered in this cause be and is hereby vacated and set aside, the same having been made in lieu of an injunction, same time affidavits of H. Hill, J. F. Hill, and J. R. Brigham filed, and the said motion to set aside sale and the confirmation thereof in this cause, coming on to be heard, and being argued and submitted, is overruled and denied."

And from the last-mentioned order the appellant appeals.

It should be further stated, that the affidavit of publication of the notice of sale, purported by way of recital, that it was made by the foreman of the printing office where it was published, but there was no direct averment in the affidavit that the affiant was foreman, nor was that fact directly sworn to, nor was there any other evidence of that fact.

This case is stated at length, as well as the briefs and points of counsel, because it is deemed one of sufficient importance, to warrant it.

*Waldo & Brigham*, for the complainant and appellee, made the following points:

The appellant must rely, to sustain his motion to set aside the order of confirmation in this case, on one or more of three grounds:

1. Irregularity of proceedings, shown by the record.

2. Surprise or fraud shown by the proof.

3. Inadequacy of price.

As to the first ground, the printed case shows that every step in the cause was taken in its proper order, and had its full time, and no irregularity is claimed by the appellant, except this: that

the printer's affidavit shows that the notice of sale was first pub-lished on the day of the decree. This would be no irregularity if it were true, but the printer's affidavit don't show it. The affi-davit states, that a copy of the notice was published for six weeks next preceding the day of sale, according to the decree, and the only ground for the statement made in the printed case is, that at the bottom of a printed copy of the notice attached to the affidavit, are certain printers' marks or abbreviations, intelligible to the trade only, and among them are the words and figures " *Sep.* 19," which it is absurdly claimed, are a part of the the printer's affidavit, and are the date of the publication of the notice. Now, these figures are no part of either the notice or the affidavit, nor are we called upon to explain them. They may signify the date of the reception of the notice at the print-ing office, or they may mean something else, or they may be wholly an error; certainly they can't signify the date of the pub-lication of the notice, since the notice itself bears date Sept. 19, and the " News," in which it was published, is a morning paper, and could not have published the notice until the 20th. But it matters not what that date signifies, for counting back from the day of sale, there were more than six weeks of time immediately before the day of sale, without counting either the 19th or 20th, and the printer swears to the publication.

The fact that the confirmation was on the same day with the sale, is no irregularity, and in this case is explained by the fact, that Saturday, the day of the sale, was the last day of the term of court. The sale was reported, found to be regular, and con-firmed as it should have been.

As to the second ground, surprise or fraudulent misrepresenta-tion on the part of the complainant, there is none shown by the proofs.

The only direct charge of surprise is Hoover's statement, that he told Hill that, considering their relations, he (Hoover) was *surprised* that Hill had commenced suit against him. This charge is not considered very grave, " *considering their relations !*"

Taking Hoover's account of the matter alone, drawn up by his solicitor for the very purpose of this case, no surprise, or fraud, or

other ground for setting aside this decree is shown.   Taking the statement as fully true, without any explanation or contradiction, it is simply this: that he found that Hill had commenced foreclosure for the purchase money of a lot which he (Hoover) had bought; that he met Hill (he omits to say that Hill sent to him) and told him that he (Hoover) was surprised, &c. ; that then he (Hoover) offered to settle by paying the debt and half the costs, which was refused; that then Hoover proposed to settle on the Monday following (it being *after bank hours*, Hoover states), which also Hill refused, as he was to go east that day, and Hoover could fix up matters after Hill's return ; that Hoover so relied on Hill's desire to settle matters after his return from the east, that he (Hoover) paid no further attention to either the suit or his debt, even after he knew of Hill's return, and so his property was sold to pay his debt as the law provides.

Taking then, Hoover's own statement as a full and true account of the whole matter, the only ground that he has to stand on is, that although he failed to make a settlement with Hill, at their first meeting, still he was so fully persuaded that he should be able to make terms with Hill, after Hill's return from the east, that he paid no further attention to the matter, and neither tried to settle with Hill, nor paid the money into court, and now complains of *surprise* that he suffered by it.

But Hoover's account, though in many particulars true, is by no means full.   To complete the story, we have also the affidavits of J. F. Hill, of Hill the complainant, and of Brigham, which show that Hill was, from the beginning, most anxious to have Hoover pay up, and let proceedings be stopped, as he well might be, as the mortgage bore only seven per cent. interest ; that Hill sent more than once to get Hoover to meet him ; that Hoover's objection that he could not pay on the day Hill was most anxious to have the thing closed, because he had no money in bank, was met by the offer on the part of Hill, to take his check dated ahead ; that a meeting was had between Hoover and Hill ; that it was *not* after bank hours ; that Hoover, instead of offering to pay up, when he found that Hill was anxious, tried to make terms with him, and offered to settle, if Hill would

stand half the costs, and when that failed, coolly told Hill that he thought the use of the money would be worth more to him (Hoover), than the extra costs he would incur by not paying till he was forced to ; that to make himself sure about the point, he inquired, and was told the time that the different steps would take before the money could be compelled of him ; that he only proposed to settle the matter on the next Monday, when he found that on Monday, Hill could not be with him, and that the conference ended with no arrangement nor expectation of any settlement except by due course of law.

These proofs show no surprise in this matter, on the part of Hoover, and no misrepresentation, fraudulent or otherwise, on the part of Hill, showing nothing but a hard man overreaching himself. If Hoover did understand that he could settle the the matter after Hill's return, why didn't he do it? Hoover had been told when the decree would be taken, and when the sale would be ; he knew that Hill was back. Here was no surprise ; nothing but neglect, at first to the injury of Hill, and finally to the cost of Hoover.

The only ground, then, for setting aside the decree of confirmation in this case, is inadequacy of price, and mere inadequacy of price. Hoover swears that the lot is worth $4,000, and it sold for less than $2,000. Will this court set aside a decree confirming a sale regularly made, for inadequacy of price alone? No such case can be found in the books, but the authorities are uniformly and strongly the other way.

The English practice of opening sales upon an advance bid, is not recognized in this country, but the English rule as to opening sale after confirmation, is the rule in this country in opening sales before confirmation. 2 *Dan. Chan. Prac.* 1464, *note and cases cited ;* 1 *Barb. Chan. Prac.* 537.

The court will not interfere for inadequacy of price merely. *Morice vs. Bishop of Durham,* 11 *Vesey,* 57 ; *White vs. Wilson,* 14 *Vesey,* 152 ; *Williamson vs. Dale,* 3 *John. Ch.* 290 ; *Andrews vs. Scotton,* 2 *Bland's Ch. Rep.* 671 ; *Gardiner vs. Schermerhorn,* 1 *Clarke,* 101 ; *Francis vs. Church,* 1 *Clarke,* 475 ; *Strong vs. Catton,* 1 *Wis.* 470.

Courts will not interfere to· set aside a sale·· regularly made, except in case of ·fraud· or of surprise generated by conduct of party having the benefit of the ·purchase, or of ·the officer making the sale, and in case of hardship to minors and sureties. ·Williamson vs. Dale, 3 John. Ch. R. 290; Duncan vs. Dodd, 2 Paige, 100; Requa vs. Rea, 2 Paige, 339; Collier vs. Whipple, 13 Wend. 226; Tripp vs. Cook, 26 Wend. 143; Francis vs. Church, 1 Clarke, 475.

The Court will not set aside a sale to relieve a party from the consequences of his own neglect· or inattention merely, where there is no fraud or misrepresentation on the part of the party benefited. Duncan vs. Dodd, 2 Paige, 100; Tripp vs.·· Cook, 26 Wend. 143; Francis vs. Church, 1 Clarke, 475; Young vs. Teague, 1 Bailey's Eq. R. 15; Am. Ins. Co. vs; Oakley, 2 Paige, 259.

Applications for a re-sale are in the favor of the court, and will not be granted to deprive a creditor of an advantage which he has gained by his diligence, where there has been no improper practice. Gardiner vs. Schermerhorn, 1 Clarke, 101; Farnham vs. Colton et al., 1 Clarke, 35.

After confirmation, sale cannot be set aside except upon grounds of ordinary equitable jurisdiction, and ·which would authorize interference in any other case. Henderson vs. Lowry, 5 Yerger, 240; Young vs. Teague, 1 Bailey's Eq. 15.

When title has vested by decree of court, it cannot be disturbed on mere motion. Parker vs. Kane, decided at the last term of this court.

.But if the court chooses· to inquire into the particular equities of this case to decide this motion, what is there to .justify the setting aside the sale here? Here is no misrepresentation by either the party or the officer; no ignorance of the situation of things, but ·full information from actual inquiry; no surprise to be remedied; no infancy to be protected against carelessness of guardians; ·no unfortunate surety bound by this decree to pay for another's default, and to· pay that which should be made out of the land; nothing here but simple neglect of Hoover to pay for his land according to his promise, and refusal to do it till

compelled by law, then an accidental forgetfulness of the day of sale and a sale of his property to pay his debt. This for the defendant. The complainant on his part, by his diligence, secures his debt, and also an otherwise desperate claim against the same parties. Does equity require that this sale should be set aside?

James S. Brown, for the defendant and appellant, argued that:

The principles governing this case are so fully discussed and determined in the case of Marshal M. Strong vs. James Catton (1 Wisconsin Reports, 471), that we deem it unnecessary fully to cite the authorities bearing upon the points made.

Jacob A. Hoover purchased a piece of property worth about $4,000, subject to the mortgage on which this suit is brought. Hill, the appellee, files his bill without making Hoover a party, but subsequently amended his bill, and caused process to be served upon Hoover; the mortgaged premises were subsequently sold for about one-fourth of their value, and the sale confirmed within an hour thereafter.

They were bid in the name of Brigham, one of the solicitors, for the benefit of Hill, and subsequently conveyed to Hill. Hoover, within three or four days after the sale, filed his motion to set aside the sale, and for liberty to pay the decree, costs, &c., and redeem the land. In addition, Hoover filed his affidavit, setting forth certain facts going to show that the sale took place in fraud of an agreement between himself and the said Hill, and that it was a surprise upon himself.

To the extent of the agreement, and in some other particulars, Hoover is contradicted by the affidavits of Hill, his brother, and one of his solicitors, but from the record and all the affidavits, we find the following facts as undisputed:

1st. That there was no moral or legal obligation on the part of Hoover to pay the mortgage, except so far as the preservation of the property to himself might require it.

2d. That before the suit to foreclose the mortgage, he had never been requested to pay the mortgage, nor was he even a

party to the suit in the first instance, but his first notice of the proceeding or of a demand, was a subpœna served upon him on the 27th day of July.

3d. That immediately after the service of the subpœna, he was notified by the brother of complainant of the claim, and met the complainant by appointment, and . offered to pay the amount of the decree and costs, but claiming that the friendly relations between himself and the complainant, entitled him to a notice before suit, insisted that he ought not to pay more than one-half of the attorney's fees, which being declined by Hill, Hoover stated that as it was the afternoon of Saturday, he could not raise the money until Monday, at which time he would pay; that Hill told Hoover that he was going east on Monday morning; that Hill did go east on Monday, and Hoover did not see him to speak with again until after the sale complained of.

4th. That the complainant and his solicitors *knew* that Hoover did not intend to let the property be sold, but *did* intend to pay the mortgage and costs before sale, and they did not doubt the sincerity of the declaration of Hoover of such intention.

5th. That, knowing this intention, and that on account of such intention Hoover employed no lawyer to watch the proceedings, Hill and his solicitors hurried forward the case with most unusual diligence,—with a diligence commendable to his solicitors, but still extraordinary; and aided by circumstances, procured a decree and went to a sale in a time unexampled in the history of judicial proceedings in Wisconsin—a time within which Hoover could not have expected that such sale could take place, and, therefore, was not on his guard; that the subpœna was served on the twenty-seventh day of July, the order to answer was entered on the eighth day of August; on the tenth of September the order taking the bill as confessed was entered; on the nineteenth day of September, or about the first day of court, a decree of sale was entered, and the advertisement of the printer has the printer's mark showing the publication of the notice of sale to have been the same day (in which case, as the "News" is a morning paper, it must have been actually printed before the decree). On the 3d day of November, at 2 o'clock, the sale

took place, and on the same afternoon the report of sale was made and confirmed.

6th. That while Hill and his solicitors were thus hastening the proceedings to a sale, knowing all the while that Hoover intended to pay before the sale, Hill saw Hoover several times (Hill riding), when he might have spoken to him, or asked him for the money, or notified him of the proceedings. but passed without uttering a word of warning (see affidavit of Hill) that the sale was advertised for two o'clock; and that before three, Hoover having by mere accident heard of the sale, went to the place designated and offered to Mr. Brigham, in whose name the bid was made, to pay decree, costs, &c.; that Brigham referred him to Hill, and immediately afterwards, on the same day, without notice to Hoover, or warning of such intention, and after the offer to pay, and the reference to Hill for an answer, procured a report from the sheriff, and a decree of confirmation from the court; that Hill amused Hoover with evasive answers for three or four days, at the expiration of which time Hoover made the application in question; that Hoover was ignorant of the time of sale, and Brigham was the only bidder.

7th. That from the time of service of the subpœna until the confirmation of the report of sale, Hoover had no notice of any of the proceedings in court; that the decree was not taken upon a call of the chancery docket, and was founded upon *ex parte* testimony, including as well solicitor's fees as the amount of the mortgage and interest.

8th. Hoover states in his affidavit that it was the understanding of himself and Hill, that he should pay the amount when Hill should return from the east; that Hill was gone some time, and although passing him (Hill being in a buggy), he, Hoover, had no opportunity of speaking to him until after the sale, and that he did neither forthwith pay up, or watch the proceedings, from a supposition that he should be called upon for the money whenever it was wanted, and from a reliance on the good faith and honor of Hill, with whom he had been on terms of intimacy and friendship; and that sale took place in violation of their understanding. Brigham, on the contrary, states that he told

Hoover how rapidly he could urge forward the suit, and how long it would be before a decree could be obtained, but Hoover chose to run the risk. While we do not doubt but that the statement of Brigham is sincere and according to his recollection of the facts, all the circumstances of the case show that Hoover could not so have understood him.

It is certain that Hoover intended to pay ; it is certain that he did not design to lose property worth $4,000 for 1,000 dollars ; it is certain that he did not mean to let the property be sold ; it is certain that he did not know of the time of sale until after it took place, and was greatly surprised at it, hurrying to the place forthwith, and within a few moments after the sale, offering to pay up decree and costs ; it is certain that Hill knew of his intention to pay—had an opportunity to ask him for the money or notify him of the proceedings, and yet urged forward the sale, and while not declining the offer to pay up, and during the pendency of the offer, took a decree of confirmation secretly from Hoover, and thus endeavored to get and hold his property at a price one-quarter of its value. While the affidavits for the complainant are undoubtedly made in good faith, all the circumstances of the case corroborate the oath of Hoover, and show that whatever was said, he has stated what he at least understood to be the truth.

9th. This maks out a far stronger case than that in the 1st *Wisconsin*, and yet the learned judge below, while he conceded that in justice, and by the general chancery practice, the sale should be set aside, cast the odium of the injustice done, on that decision, and refused the application.

We are willing to have the motion abide by the principles established by the Supreme Court in that case, and for that reason content ourselves by referring to that decision and the authorities there cited. *Strong vs. Catton*, 1 *Wisconsin*, 471 ; 2 *Dan. Ch. Practice*, 923 ; *McCulloch vs. Calbalch*, 3 *Maddock*, 314 ; *Thornhill vs. Thornhill*, 2 *J. & W.* 347 ; *Tyndale vs. Warre*, *Jac.* 525 ; *Lefroy vs. Lefroy*, 2 *Russell*, 606 ; *Regnay vs. Rey*, 2 *Paige*, 341 ; *Collier vs. Whipple*, 13 *Wend.* 226 ; 3 *Vesey*, 170 ; 8 *Paige*, 337 ; 9 *id.* 259 ; *Sumner vs. Charlton*, 5 *Vesey*, 655.

In this instance the order of confirmation should make no dif-
ference, inasmuch as the offer to pay was made before confirma-
tion, without notice, on the same afternoon with the sale, and
while the offer was neither accepted or rejected by Hill.

10th. We call the attention of the court to the fact that all
the orders were taken without notice; that the decree was not
taken on the call of the chancery docket, and also to the insuffi-
ciency of the affidavits of publication after the notice of sale.

. *By the Court,* COLE, J.  I am of the opinion that the order of
confirmation in this cause must be vacated and set aside, for the
reason that the proof of notice of sale, filed by the sheriff with
his report, is insufficient.  The statute provides (*sec.* 65, *chap.* 98)
that " the affidavit of the printer, or foreman of such printer, of
any public newspaper published in this state, of the publication
of any notice or advertisement which by any law of this state
shall be required to be published in such newspaper, shall be
entitled to be read in evidence in all courts of justice in this
state, and in all proceedings before any officer, body or board,
and shall be *prima facie* evidence of such publication, and of
the facts stated therein."

As this evidence is admissible only by virtue of the above pro-
vision, the affidavit cannot be admitted unless it is in strict con-
formity to it.  It is necessary that it should be made by the
printer, or the foreman of the printer, of the newspaper in which
the notice is published; and that fact must be distinctly stated
in the affidavit, and sworn to by the person making it.  It is a
material part of the affidavit, and cannot be dispensed with.  In
the present case the affiant, by way of recital, describes himself
as foreman, but he does not swear that he is foreman, conse-
quently the affidavit is not such as the statute requires.  A cor-
rect form is given in 2 *Barb. Ch. Pr.* 706.

The application made in the Circuit Court on behalf of the
appellant, was not only to vacate the order of confirmation, but
to set aside the sale altogether, for several reasons set forth in

the motion. It is not necessary to further notice the first reason assigned; and it is perhaps sufficient to say, in regard to the second, that Hoover was not entitled to notice of the proceedings, since he had made no appearance in the cause. But the main grounds relied upon, in the court below, and in this court, to set aside the sale, are, 1st, surprise; and 2d, inadequacy of price paid at the sale. It is insisted that the sale should be set aside on account of surprise, or because Hoover was in some way misled by Hill; and that this case is within the principle of *Catton vs. Strong* (1 *Wis. R.* 471); and several others, cited upon the briefs of counsel. I do not propose examining these cases at any length, and will only remark, in reference to them, that they do not appear to me to support the present case. In that of *Williamson vs. Dale* (3 *J. C. R.* 290), the executors were induced to believe the sale would not take place when it did; and this belief was founded upon representations made to them by their agents, of conversation which he had held with the plaintiff and his solicitor; consequently they were surprised by the sale and not prepared to meet it. These representations were verified by affidavits which were not contradicted. In that of *Collier vs. Whipple* (13 *Wend.* 224), the conduct of the master, who made the sale, was calculated to mislead, and did mislead the agent of Whipple, as to the time the sale would take place. In that of *Tripp vs. Cook* (26 *Wend.* 143), Tripp, who was surety, in an interview he had with the complainant and the agent of Cunningham, the principal debtor, understood, and was led to believe by them, that the suit would be settled. This conversation was had between the parties about a week after the service of the subpœna upon Tripp. He acted upon this supposition, and heard nothing to the contrary until after the sale of the mortgaged premises, and the levying of an execution upon his own property for the deficiency, although he resided in the same place with the complainant, and saw him almost daily. In *Strong vs. Catton*, the latter had had different conversations with the complainant, Martin, upon the subject of postponing the sale, so as to enable him to raise the money to pay off the decree; and Martin assured Catton he would consult his

interest as to the time of sale. From these assurances Catton was induced to believe there would be a postponement of the sale, and remitted his exertions to obtain money to discharge the decree.

If we examine the affidavits filed on the hearing of this application for a re-sale, we shall find that they present no such case as any of those we have been considering. It appears that the parties had an interview for the purpose of settling the suit, at the office of Wells & Brigham. This was on the 11th of August, a few weeks after Hill filed his bill of foreclosure against the mortgagors, the Nelsons, and very soon after the service of the subpœna upon Hoover. Hill was about going east, and was in need of the money due upon the mortgage. He requested his brother Joseph to see Hoover, and urge upon him a settlement. Hoover had purchased the property, subject to the mortgage, and it was but reasonable to suppose that he would be anxious to discharge it, and save the costs of foreclosure. At this interview, Hoover in substance says in his affidavit, after stating to Hill that he was surprised, considering their relations, that the mortgage should have been foreclosed without notice to him; that he proposed paying the amount due, and settle the matter, but claimed that since he had always been ready to pay, he ought not to be required to pay more than half of the solicitor's fees secured by the mortgage; that Hill said affiant must pay the costs, but that he (Hill) was then going east, and that the affiant could fix up matters after his return; and further, that this conversation was on Saturday after bank hours; and that he expressly stated that he would settle the amount and costs on the next Monday, when Hill stated he was going east as aforesaid; that the affiant had always been ready and willing to pay the amount of said mortgage, costs and interest, and understood that Hill desired it settled after his return, and that no advantage should be taken of him for that reason; that he did not afterwards see Hill, except in a buggy passing, until after the sale; and that relying on the understanding aforesaid, he employed no lawyer to watch the proceedings, and was utterly ignorant of the decree and sale until after it took place.

Hill, in his affidavit, gives quite a different account of this whole transaction. He states that on or about the 7th of August he met Hoover at the Cold Spring House, and that they had a conversation about the suit; that Hoover said he was willing to pay the amount due on the mortgage, and would call next day at his office and settle; that he did not want to put the affiant to trouble, and wished to avoid costs. He says that Hoover not coming as he agreed to, he requested his brother Joseph to see him and urge him to come down and settle as he had proposed; that his brother did see him, and by agreement they met at the office of Wells & Brigham, at 2 P. M., on the 11th of August; that at this interview, Hoover proposed to settle by paying the amount of the note secured by the mortgage and one-half of the costs, and that he insisted upon his paying the whole amount of the note and the costs, and refused to settle upon any other terms; that Hoover then said that money was worth twelve per cent. to him, and that he believed he could make as much upon the money as the costs would be, if he let the suit go on, or words to that effect; that Hoover afterwards said, that he had not the money with which to pay the note then, and that he should be obliged to see if he could raise it; that he then stated to Hoover that he should start for Buffalo the next day, or early the day after, and that it must be fixed then to be of any use to him. Hoover said this was impossible, and that the matter must be left until his return, and so the conference ended; that he went away with the impression that Hoover chose to keep his money till a decree could be obtained, and pay extra costs, and that he directed his solicitors to press the suit as fast as possible.

This statement of Hill is strongly corroborated by the affidavit of his solicitor, Brigham. He states that he was present at the interview between the parties, and that in the conversation, Hoover inquired of him the probable time it would take to get a decree against him, for the purpose, as deponent understood, of determining whether it was better to pay up at that time, or let it run till he was compelled to pay by a decree; that he then informed Hoover that there would probably be a decree in September following, and otherwise generally stated to him the time

that would probably be required for the several steps before sale, as nearly as he could, which deponent believed did not vary much from the time actually taken.

I do not deem it necessary to make any further observations upon these affidavits, than to say, that I do not think they show a case of surprise as to the sale, or furnish any foundation for the charge that Hoover was misled about the suit by either Hill, or the complainant's solicitors. Hoover must have known that he could put an end to the suit at once by paying the requisite amount into court, or to the solicitors of complainant. If he was really anxious to settle, why did he not do this? Or, why did he not inquire for and find Hill? He knew that Hill had returned from the east. It is certainly a little remarkable that he did not find him and, " fix up matters," as he says he understood was to be done after his return. It was not Hill's business to run after him, and he had no right to expect it, after what had passed between them. The conclusion to which I have come upon these affidavits is, that after the interview on the 11th of August, the parties intended to keep each other at arm's length, neither giving or asking favors. Hill did not expect his money until decree and sale, and Hoover did not intend to pay until that time; for if he had, there was every opportunity for him to have done so. He probably did not intend the property should be sold, and pass into other hands. He undoubtedly expected to be present at the sale, and it is attributable to his own negli-gence that he was not.

Ought the sale to be set aside on account of the inadequacy of the price paid upon the sale? The property was bid in by the solicitor of the complainant—doubtless, for the use of the complainant—for $1,138.06, the amount of the decree and costs. Hoover swears that the property was worth, at the time of the sale, $4,000. At sheriffs' sales, property is almost always, in this country, sold at a sacrifice. Probably this is the experience and observation of all. And it is highly important, in order to secure reasonable competition, that there should be confidence in the stability of these sales, otherwise the great inducement for bidding will be taken away. These obvious considerations of

expediency, and sound public policy, have time and time again, been stated and enforced by the most eminent judges. Consequently courts will not disturb these sales except in special cases. *See Strong vs. Catton, Tripp vs. Cook, Williamson vs. Dale, Collier vs. Whipple*, cited above; also *Lansing vs. McPherson*, 3 *J. C. R.* 424; *Duncan vs. Dodd*, 2 *Paige*, 99; and cases cited in note "2," 2 *Dan'l Ch'y Prac.* 1465. In this case there is no ground for saying that Hoover was misled by the complainant or his solicitor. His property was sacrificed through his own neglect or inattention to look after it. There is no deficiency to be paid by him or anybody else. He does not stand in the attitude of an infant, surety, or of a creditor, interested in the equal distribution of an insolvent estate. I therefore think that the Circuit Court very properly refused to set aside the sale. But the order of confirmation of sale must be reversed and cause remanded for further proceedings, according to law.

SMITH, J., *dissenting*. It cannot be denied that powerful appeals have been made to the court to sustain this sale, and strong reasons, founded upon public policy, have been presented with all the force that could be derived from the character of the parties, the acknowledged ability of the counsel, and the somewhat peculiar circumstances of the case, and of those to be affected by its determination.

It is said (not probably intended to be asserted, that the substantial equities, or the rigorous law of the case, is thereby changed), that here are contending two full grown men, each abundantly competent to protect his own interests, acting with full knowledge of all, or at least, each presumed to have full knowledge of the consequences of his own conduct, and hence there is no occasion for the interposition of a court of equity for the protection of the weak against the aggressions of the strong, or for the rescue of ignorance from the fangs of unscrupulous intelligence.

Were this the only consideration involved in this case, little

hesitation would follow its statement. Yet it should not be forgotten that it is from just such cases, where the character, circumstances and condition of the parties are in equipoise, that fatal precedents intrude to disturb the course of justice, when the circumstances and condition of the parties are widely different. Hence it is necessary to look beyond the immediate parties, their condition and circumstances, to the facts of the case, and from these to deduce a rule of judgment or administration that will answer the ends of equity, whatever may be the character or condition of those who are to be affected by it. The same facts which are to govern the determination of this appeal, must govern all others of like nature hereafter, however the circumstances of the parties may differ, provided they be of full age, and competent to act for themselves. No fraud upon, nor any undue advantage of any infirmity of body or understanding, is alleged to have been taken. The subject matter for adjudication stands upon the simple facts and transactions as they are presented by the appeal. Therefore, the fact that both parties are in affluent circumstances, should have no weight whatever, any more than though the mortgagee was wealthy and the mortgagor was poor.

It is also urged with great earnestness, that there should be some certain, definite, fixed rule established, whereby gentlemen of the profession may safely advise a purchaser at chancery sales, without fear of the interposition of the court to set them aside, and that public policy, as well for the interest of the mortgage debtor as for that of the creditor or purchaser, requires such a rule; that the certainty of the purchase would tend to enhance the prices, would give a stability to judicial sales, and solidity to titles so acquired, which would operate equally to the advantage of the debtor and creditor. Nor can it be denied that there is force and philosophy in these suggestions to a certain extent, the boundaries of which cannot be better defined than by those rules of equitable and fair dealing, sanctioned by the universal conscience of mankind, admitted by all, denied by none, and which, by their power upon the conscience, become the law of association and the rule of conduct.

Courts of equity frequently interfere to protect the weak against the strong, and innocent ignorance against grasping and unscrupulous intelligence; not, however, because of the feebleness of the weak, or want of sagacity of the ignorant, but because injustice has been done or menaced them by taking advantage of their weakness or ignorance. The equity of the transaction under review, not the character and condition of the parties, is the subject of the present inquiry.

If it be true, as counsel contend, that here are two full grown men, each striving to obtain an advantage over the other, it is nevertheless true, that the demands of equity are as potent between full grown men as men of a lesser growth. Justice is neither more nor less than justice, whatever may be the character of those seeking its award.

In regard to the requirement of this court to lay down some fixed and unyielding rule, by which counsel may advise their clients when it will be safe for them to bid at a chancery sale, and be sure that their bids will not be disturbed, it is certainly proper, if not unnecessary, to remark, that the establishment of such a rule would subvert the very objects and ends of a court of equity in that behalf. When justice and fair dealing have been observed upon these sales throughout, courts of equity seldom interfere; but there are a thousand modes in which any rule possible to be established might be evaded, and any attempt to establish any such inflexible rule would be subversion of the purposes and functions of equity jurisprudence.

It was also urged, as before intimated, that there should be a legal certainty affixed to these sales for the benefit of the unfortunate person or persons whose property is sold; that the property will bring a higher price if the sale is to be considered a finality, &c. But however strongly such considerations may be urged, the essential functions of a court of equity must not be overlooked in mere speculation upon matters of social or political economy; designed as they are, to reach every individual case, to penetrate and search out individual wrongs, to probe the personal conscience; or, at all events, to bring up the conscience of those to whose arbitrament the matters may be committed, to

Hill vs. Hoover and others.

the highest standard consistent with the course of justice and the general principles of equitable administration. Theoretically, the views of counsel may be correct, but practically, they have not yet been realized. On the contrary, such applications have always been of frequent occurrence, and will doubtless continue for the purpose of relief against the effects of accident, mistake, fraud and oppression. It can hardly fail to be observed, that these economical suggestions, so replete with solicitude for the interests of the unfortunate debtor, are always urged by the purchaser whose interest is adverse to that of the involuntary vendor.

While it is admitted that a just system is adhered to, so far as it is practicable, to give stability and efficacy to chancery sales, it must not be forgotten that the very object of the institution of equitable jurisprudence, in reference to the relations of parties so situated, was to ameliorate the stern requirements of the law upon the literal tenor of their contracts. The right of redemption is a peculiar feature of that jurisprudence, stepping in between the harsh demands of legal forfeiture and the subjects of misfortune, accident, mistake or surprise, incident to human infirmity. Its object is to bring all the parties up to the standard of equal and exact justice. The rules of law are inflexible, and for that very reason those of equity are flexible.

Let us now proceed to consider the facts in the case, as they are presented on this appeal. I do not propose to recapitulate them in detail, but refer to their statement preceding. Nor do I consider it important to comment upon those which appear in the affidavits, *pro* and *contra*, but only to allude to the main facts, as they appear established by all the evidence in the case.

The first fact that appears in the statement is, that the appellant Hoover, was under no moral obligation arising out of contract to pay the mortgage debt for which the land was holden. He was not a party to the mortgage, but had only bought the premises subject thereto. In the next place, Hill had an equitable and legal lien upon the mortgaged premises, which he had a right to subject to the payment of his mortgage debt against the Nelsons. Whenever that debt was satisfied, his claim upon the land was extinguished, unless that fact was accomplished by the sale and

purchase thereof. If Hoover did not pay the mortgage when due, Hill had a perfect right to proceed to foreclosure, and to be indemnified for his legal costs and charges. But there was no breach of faith on the part of Hoover, in not paying the mortgage at the day, as between him and Hill, because there was no privity of contract between them. Hence the equity between these parties was, that Hill might foreclose his mortgage and thus satisfy his debt, and that Hoover might pay the mortgage interests and costs at any time before the foreclosure proceedings should be consummated.

The mortgage was not paid, either by the mortgagors when it became due, or by Hoover, who purchased the premises subject to the mortgage; and Hill, the mortgagee, proceeded to foreclosure. It appears that the mortgaged premises, so situated, were advertised to be sold, under the decree of foreclosure, on the 3d day of November, 1855, at the court-house in the city of Milwaukee, at 2 o'clock, P. M.: that the sale was made to the complainant, or rather to the complainant's solicitor, for his benefit, and, as was stated, no other bidder being present to bid, for from one-third to one-fourth of the value of the property sold; that within one-half hour to one hour after the property had been stricken off, and as it would appear, and must necessarily have been the fact, before the report of sale, or confirmation thereof (for though the affidavits are not explicit on the subject, it is quite apparent that the report could not have been made out within that time, nor inspected by the court), the defendant Hoover, having been casually informed of the sale, called upon the complainant's solicitor at the place of sale, and then and there offered to pay the whole amount of the mortgage debt, interest and costs: that the complainant's solicitor then and there informed him that although the property had been bid off in his name, yet it was for the benefit of the complainant Hill; that he had no authority to make any arrangement, and referred him to Mr. Hill, who was alone authorized to negotiate on the subject: that therupon, Hoover went in pursuit of Hill, but was unable to find him for some two or three days; that notwithstanding the complainant's solicitor had thus referred

the matter to the complainant, to accept or reject of his proposition, he on the same afternoon proceeded to have the deed executed and recorded, the sheriff's report of sale made to the court, an order of confirmation awarded, drawn up and signed, *and all this must have been accomplished within two or three hours from the time fixed for the sale,* which was made, only one bidder being present, and that bidder the complainant's solicitor. How long a time could the property have been cried by the officer?

If the sale, which was advertised at 2 o'clock (and it must be recollected that timepieces vary materially, there being no common standard), was concluded within half an hour to one hour from the time advertised, and within two or three hours the deeds passed, and were recorded, the order of confirmation awarded, signed and entered, the report of sale drawn up, submitted to the court, and inspected, it is still more apparent that all these duties could not possibly have been properly performed within so short a time. And when it is shown that there has been a great sacrifice of property, whether the necessary result or not of such haste, it becomes the duty of the court to interpose, and instruct its officers more specifically in relation to the execution of its orders and decrees. If the sale, report thereof, conveyance, confirmation, &c., were all accomplished before Hoover arrived, viz.: within one-half to an hour and a half after the time fixed by advertisement for sale; and if all this could not possibly have been properly done within the time mentioned (as most certainly it could not), purchasers at sales so conducted, whether parties to the suit or not, have no cause of complaint, if the court does interpose to correct any error which may have occurred in its ministerial administration.

Officers who make these sales are not the mere agents of the complainant who has sought and obtained the decree. They are executing a sacred trust, committed to them by the court, and they should be held to strict integrity and reasonable discretion in the performance of these duties.

And here it may well be asked whether the officer making this sale was strictly mindful of his duty in the premises? I do not mean to intimate that there was any intentional wrong on

his part. He might have supposed that the parties defendant designed to abandon the property to the complainant; he might have been ignorant of its value; he might have supposed that the sale was one of form merely. However this may have been, the result is the same.

It seems impossible for me to believe that this was a fair sale, judiciously managed by the person conducting it. Here was property to a large amount (some $4,000), every proceeding in the process of foreclosure was taken at the earliest possible moment. The sale occurred on the 3d of November, and from all the circumstances in the case, as well as the direct evidence produced, it could not have been cried by the officer, but for a very brief period, less, very much less than an hour, and in so short a space of time, too, sold to the complainant, he being the only bidder; and on the same afternoon, the report made, the deed executed, the report examined (as we must presume carefully) by the court, order of confirmation made, drawn up, inspected, and signed by the court. The sale was advertised to be at two o'clock, and the question significantly recurs: how long did the officer cry the property?

Sales of this kind are made by the authority of a court of chancery, and such court is bound to see that they are fairly and properly conducted in conformity with the demands of equity and good conscience. They are the sales of the court, and not of the mere ministerial officer who executes them.

If there were nothing more in this case than that the defendant appeared upon the ground at the place of sale, in half an hour or an hour after the property had been struck off, and then and there offered to pay the whole debt, interest and cost, thus fulfilling to the uttermost the object and scope of the order of sale, and this fact was made known to the court, would the sale be confirmed? It must be recollected that this is not an application for re-sale on the ground of *mere* inadequacy of price, but it is a motion to resist or set aside the sale and order of confirmation, on the ground, among other things, of full satisfaction made, or, what is the same thing, offered.

This case stands upon the same ground as if the motion to

resist confirmation had been made on the afternoon of November 3d ; for the offer to pay the decree and costs was then made, at the place of sale, and very soon thereafter, upon which the solicitor of the complainant, who was the purchaser for him, referred the defendant to the complainant, and who, while he was in pursuit of him, immediately proceeded to procure an order of confirmation. Now, had these facts been made known to the court, on the application for such order, would the court have granted it ? Yet the facts existed at the time, and were brought to the knowledge of the court, at the earliest practicable moment, and should have the same effect as though they had been interposed at the time, as doubtlessly they would have been, had not the defendant been referred to Hill by the solicitor.

In the case of *Strong vs. Catton* (1 *Wis.* 493), this court say : "But if it be true, as we are told in the argument, that Mr. Strong was the only bidder at the sale, it was the duty of the officer to postpone the sale, in order that the property, by competition in bidding, might bring a fair price. There is no doubt, that for this purpose, it is within the discretion of the officer to postpone the sale." Much less, therefore, should he be permitted to sacrifice property by crying it for only a few minutes from the earliest moment fixed, and that, too, in a place where timepieces vary as they generally do. We are not informed, except as was said upon the argument, how long the property was cried in this case, but we do know that the whole business of sale, making report, executing deed, examining reports, drawing and passing order of confirmation, was completed in a very short time, far too short for that deliberate and cautious action which should always characterize the proceedings of a court in equity, in disposing of property or rights committed to its charge. And when we are further informed, as we were on the argument, that the examination of the report, and passing of the order of confirmation, was made in the midst of a jury trial, without any regular call of the calendar or the case, it is impossible for me to bring my mind to the conclusion that the rights and interests of the parties were properly cared for in this case.

It must be kept constantly in mind, in this case, that by the

decretal order, and advertisement of sale of the mortgaged premises, the hour of sale was fixed at two o'clock P. M. : the value of the property to be sold was some $4,000 or more, and yet this property must have been "*cried*" only about half an hour at the longest, and struck off to the complainant's solicitor for about one-fourth its value, for the benefit of the complainant, he being the only builder at the sale, and practically, the property not having been cried at all at public sale.

A court of equity ought not to sanction such proceedings. Hoover appeared just after the officer had ceased to cry the property, and as soon as he knew of the sale, and offered to pay the whole amount of debt, interest and costs. He (Hoover) swears in his affidavit that he was ignorant of the sale. It is apparent that he did not intend that the property should go to sale. He was under no moral obligation to pay the mortgage debt : that is, there was no moral obligation as between him and Hill to pay it, although the property was primarily bound to its full satisfaction.

Substantially and briefly, the case may be stated thus : Hoover bought the premises subject to the mortgage of Hill. Hill was anxious to get his pay, as he had a right to do, at the earliest practicable moment. It was morally certain that the Nelsons would not pay, and that the property was the only source of security or payment. The proceeding of foreclosure was urged forward as rapidly as the forms of procedure would permit. A final decree was pronounced, in pursuance to which the property was advertised to be sold on the 3d day of November, at the court-house in Milwaukee, at two o'clock P. M. Hoover interposed no defence or obstacle to the proceeding of the complainant. He sought no delay. He was ignorant of the time of the sale, but was casually informed thereof, and at about $2\frac{1}{2}$ or 3 o'clock, reached the place of sale, and offered complete satisfaction of the debt, interest and cost. The sale had been already concluded ; the property stricken off to the solicitor of the complainant, he being the only bidder, in behalf of the complainant, at about one-fourth or one-third of its actual value, not having been cried, as is apparent, more than from one-half of an

hour to an hour. On the offer of the whole debt, interest and cost, the solicitor referred Hoover to the complainant, and while he was in pursuit of him, proceeded, on the same afternoon, to obtain the ear of the court and procure confirmation of the sale. The question is, is it right and just that this sale shall stand? I am compelled to say that such confirmation is repugnant to my sense of justice. It was most assuredly the right of complainant to obtain the satisfaction of his debt, interest and costs, out of the mortgaged premises. But when that offer was made to his solicitor, at about three o'clock P. M. on the day of sale, the whole object of the foreclosure suit was accomplished. It is very apparent that the appellant was unaware of the time of the sale; that he did not intend the premises should go to sale; and that he offered full payment. Was it right, therefore, for the complainant's solicitor to proceed, on the afternoon of the sale, to confirmation, after having referred the appellant to the complainant, with the offer of satisfaction that had been made? I impute, of course, no moral wrong to the solicitor. But again it may be asked, was it right and proper for the court to pass in such hasty and necessarily inconsiderate manner, the report of sale and order of confirmation thereof? The court, doubtless, was entirely unaware of any of the rights or equities of Hoover in the matter, and no imputation is made or intended against the proceeding of the court. But I am constrained to believe that all the equities which Hill had a right to demand were fully met by the offer of Hoover, and that the sale itself should be set aside, and not merely the order confirming it, for defect of notice, or rather in the proof thereof.